Landrith v. Hudgins.

IRA LANDRITH *et al. v.* J. L. HUDGINS *et al.*

*(Nashville.* December Term, 1908.)

1. RELIGIOUS SOCIETIES. Implied power of churches to unite
when there is no explicit pronouncement to the contrary in
their constitutions.

The implied power of union of one Christian church with an-
other, involving the surrender of the organization of one of
them, exists, where there is no explicit pronouncement to the
contrary in their constitution, religious standards, or forms
of government. There is nothing in the constitution or or-
ganization of the Cumberland Presbyterian Church to indi-
cate that it was intended to be a perpetual organization, so
that it had or has the power, if properly exercised, to unite
with the Presbyterian Church in the United States of Amer-
ica. (*Post, pp.* 573, 574, 584, 585, 593, 596, 597.)

2. SAME. Same. The power of union of churches must be ex-
ercised in accordance with their constitutions.

The power of one church to form a union with another, when
it exists, must be exercised in accordance with the manner in-
dicated by the constitution or constituent contract by which
the organization is bound and held together. (*Post, pp.* 585, 594,
595, 597, 680, 681.)

Cases cited and approved: Lamb v. Cain, 129 Ind., 515; Col-
lege v. Wyatt, 27 Ore., 475; Bear v. Heasley, 98 Mich., 308;
Russie v. Brazzell, 128 Mo., 93; Jaicks v. Sullivan, 128 Mo.,
187; Hochreiter's Appeal, 93 Pa., 479, 484.

3. SAME. The church session is the governing agency of a
congregation of the Cumberland Presbyterian Church.

The church session of the Cumberland Presbyterian Church,
composed of two or more ruling elders, elected by the con-
gregation, and the minister in charge who is attached to the
congregation by the combined voice of the presbytery, the
session, and the members, is the governing agency of the
congregation. (*Post, pp.* 586, 587, 590, 591, 592.)

Landrith v. Hudgins.

**4. SAME.** Question of union with another denomination must be submitted to the presbyteries and not to a per capita vote of the various congregations.

The question of union between the Cumberland Presbyterian Church and the Presbyterian Church in the United States of America cannot, under the Presbyterian or Cumberland Presbyterian form of government, be submitted by the general assembly to a general *per capita* vote of all the congregations, but can only be submitted to and be determined by a vote of the presbyteries consisting of pastors or ministers representing the church at large and elders representing the various congregations, the result of which shall be subsequently declared by the general assembly. (*Post*, pp. 587-590, 594, 596, 597.)

**5. SAME.** Jurisdiction or power of government of each particular Cumberland Presbyterian Church is lodged in its church session.

Under the Presbyterian or Cumberland Presbyterian form of government, the jurisdiction, or power of government, in each particular church, namely, that part of the sovereignty of the whole which belongs to each particular church organization, is lodged in the church session, and not in the members at large. (*Post*, pp. 590, 591, 592.)

**6. SAME.** Amendments cannot be made by action negativing the specific rule for amendments prescribed in the constitution of of a church.

Under the constitution of the Cumberland Presbyterian Church, providing a specific method for the amendment of its constitution, Confession of Faith, and Catechism, to be proposed, recommended, and submitted by its supreme judicial authority, known as the "General Assembly," a representative body, to the presbyteries, such provision cannot be disregarded and the amendment made effective by treating the vote taken as equivalent to an amendment or by an act negativing the rule of amendment, or by mere negative action by the organization, the general assembly and the presbyteries, without violating

an obligation- to the members, because the method prescribed
for amendment is a part of the constituent contract which
the members of the church have- a right to rely upon. (*Post,*
*pp.* 595, 596, 641-645.)

7.   **SAME. Whole plan of union and not simply a part thereof
     must be submitted to the presbyteries of the Cumberland Pres-
     byterian Church, when.**

Under a plan of reunion and union of the Cumberland Presby-
terian Church with the Presbyterian Church in the United
States of America, involving the surrender of the name, the
creed, and organization of the Cumberland Presbyterian
Church and its absorption by or incorporation into the other
church and under its name, and also the acceptance by its
members of the doctrines and Confession of Faith of the
said other church, as revised in 1903, and of its doctrinal and
ecclesiastical standards, where the only part of the plan sub-
mitted to the presbyteries of the Cumberland Presbyterian
Church was embraced in a question to which they
were required to return a categorical answer of either
approval or disapproval, which only asked whether the pres-
byteries were- in favor of the reunion and· union on the basis
of the revised Confession of Faith and other doctrines and
ecclesiastical standards of the Presbyterian Church in the
United States of America, etc., the general assembly of the
Cumberland Presbyterian Church, by such submission and
the acceptance of such plan by the result of the vote of the
presbyteries, as duly ascertained and declared, had no power
to surrender the name and organization of the church and to
dissolve it by consenting to its absorption by the Presbyter-
ian Church in the United States of America. (*Post, pp.*
597-604, 682, 683.)

8.   **SAME. Doctrines of the Presbyterian Church in the· United
     States of America are not substantially the same as those of
     the Cumberland Presbyterian Church.**

The doctrines of the Presbyterian Church in the United States
of America as contained in its Confession of Faith and other

Landrith v. Hudgins.

standards, as revised in 1903, still retain the doctrinal standards of the Westminster Confession of Faith, and are not substantially the same as the doctrines of the Cumberland Presbyterian Church. (*Post, pp.* 604-641.)

9. **SAME.** Land conveyed to a church cannot be diverted to a **different faith without a valid change of the faith of such church.**

Where land is conveyed to officers of the Cumberland Presbyterian Church and their successors in office for the use and benefit of said church, it cannot, without a breach of contract, be diverted to the maintenance of a different faith, unless the Cumberland Presbyterian faith has been changed into a new form by competent ecclesiastical authority. (*Post, pp.* 572, 573, 628, 640, 675-681.)

Code cited and construed: Secs. 2563, 2564 (S.); secs. 2007, 2008 (M. & V.); sec. 1509 (T. & S. and 1858).

Cases cited and approved: Schnorr's Appeal, 67 Pa., 146; Miller v. Gable, 2 Denio (N. Y.), 548, 555, 556; Smith v. Pedigo, 145 Ind., 416; Hale v. Everett, 53 N. H., 9; Farraria v. Vasconcelles, 23 Ill., 456; Kniskern v. Churches, 1 Sandf. Ch., 439, 7 N. Y. Ch. Rep., 435, and note on page 437; Roshi's Appeal, 69 Pa., 468.

10. **SAME.** Same. Trust created by conveyance for money as well as by a gift.

In the creation of the trust as shown in the next preceding headnote, it is immaterial that the trust had its origin in a conveyance for a money consideration instead of a donation. (*Post, pp.* 678, 679.)

11. **SAME.** Submission of question of union not involving a question of amendment of the constitution and Confession of Faith of a church; case in judgment.

Under section 60 of the constitution of the Cumberland Presbyterian Church providing that, upon recommendation of the General Assembly at a stated meeting by a two-thirds vote, the Confession of Faith, Catechism, Constitution and Rules

of Discipline may be amended or changed by a majority of the presbyteries, on the same being transmitted for their action, if they shall approve the same, and under a submission, by the said General Assembly to the presbyteries, of a basis of union of such church with the Presbyterian Church in the United States of America, founded on the question whether they would sanction a union on the basis of the Confession of Faith of the latter church, without the submission of any question whether the Cumberland Presbyterian Church would amend its own Confession of Faith into a form more suitable, but submitting the question as aforesaid whether it would unite with the other church on the basis of the latter's Confession of Faith, a vote of a majority of the presbyteries in favor of the union, duly and properly ascertained and declared, did not constitute an amendment of the constitution or Confession of Faith of the Cumberland Presbyterian Church. (*Post, pp.* 641-645, 680, 681.)

12. **SAME.** Determination of ecclesiastical questions by ecclesiastical bodies is not conclusive upon the civil courts in determining property rights in church property.

The civil court, administering the law of the land, in disposing of property rights in church property has the power to determine for itself, as a necessary preliminary, the theological questions involved, as being in the nature of the facts on which the controversy must turn. The determination of an ecclesiastical question by an ecclesiastical body, *legislative or judicial,* is not binding upon a civil court administering the law of the land, in disposing of property rights in church property, when the correct view of the nature, means, extent, and bearing of such ecclesiastical question is necessary to be determined in order to settle such property rights. (*Post, pp.* 627, 628, 645-683.)

Cases cited and approved: Deaderick v. Lampson, 11 Heisk., 523; Reeves v. Walker, 8 Bax., 277; Rodgers v. Burnett, 108 Tenn., 173, 183; Watson v. Jones, 13 Wall., 679; Bouldin v.

Landrith v. Hudgins.

Alexander, 15 Wall., 139; Watson v. Avery, 2 Bush (Ky.), 332; Gartin v. Penick, 5 Bush (Ky.), 123, 124, 9 Am. Law Reg. (N. S.), 213; Perry v. Wheeler, 12 Bush (Ky.), 541, 554, 556; Church v. Wilson, 14 Bush (Ky.), 252; Krecker v. Shirey, 163 Pa., 534; McGinnis v. Watson, 41 Pa., 9, 14-16, 20, 23, 29; Schnorr's Appeal, 67 Pa., 138, 146, 147; Roshi's Appeal, 69 Pa., 462, 467; McAuley's Appeal, 77 Pa., 397, 412; Kerr's Appeal, 89 Pa., 97; O'Hara v. Stack, 90 Pa., 477, 490; Smith v. Pedigo, 145 Ind., 361, 392, 416; Ferraria v. Vasconcelles, 23 Ill., 456; Vasconcellos v. Ferraria, 27 Ill., 237; Ferraria v. Vasconcellos, 31 Ill., 54, 55; Sweiker v. Husser, 146 Ill., 399, 435, 436; Kuns v. Robertson, 154 Ill., 394, 400, et seq., 415, 416; Chase v. Cheney, 58 Ill., 509, 10 Am. Law Reg. (N. S.), 295; Church v. Whitmore, 83 Iowa, 138; Cape v. Church, 117 Wis., 150-155; Franke v. Mann, 106 Wis., 132; Watson v. Garvin, 54 Mo., 353, 354, 374, et seq.; Russie v. Brazzell, 128 Mo., 93; Schlicter v. Keiter, 156 Pa., 119; College v. Wyatt, 27 Ore., 390; Lamb v. Cain, 129 Ind., 486; Gable v. Miller, 10 Paige (N. Y.), 627, 647; Miller v. Gable, 2 Denio (N. Y.), 492, 540-549, 552-570; Attorney-General v. Pearson, 3 Meri., 353, 355; Watkins v. Wilcox, 66 N. Y., 654; Kniskern v. Churches, 1 Sandf. Ch. (N. Y.), 439; Stebbins v. Sherman, 1 Sandf. Ch. (N. Y.), 510; Attorney-General v. Dublin, 38 N. H., 460; Hobby v. Morton, 33 Ill., 398; Fadness v. Braunborg, 73 Wis., 257; Bear v. Heasley, 98 Mich., 279; Lemp v. Raven, 113 Mich., 375; General Assembly of Free Church of Scotland, et al. v. Lord Overton et al., Law Reports, Appeal Cases, 515, 516, 627, 628, 669; Everett v. Church, 53 N. J. Eq., 500, 517, 518; Connitt v. Church, 54 N. Y., 551, 554, 557, 558, 560, 563; Nachtrieb v. Harmony Settlement, 3 Wall., Jr., 66 Fed. Cas., No. 10,003; Bonacum v. Murphy, 71 Neb., 463.

13. **SAME.** Same. Determination of ecclesiastical questions by ecclesiastical bodies is conclusive upon civil courts, except as to property rights in church property.

The civil court cannot invade the sacred inclosure of the church, and assume to direct its teachings, or the administration of its

121 Tenn—36

Landrith v. Hudgins.

rites and ceremonies, or to hinder the imposition of its censures, nor will the civil courts intermeddle or interfere with the internal administration of the affairs of the church, such as disciplinary cases, cases involving the exscinding of members, and the administration of rules and ordinances, and the like, where the ecclesiastical body acting, or undertaking to do so, is clothed with the power and jurisdiction to act in the matter; but where property rights in church property are involved, the courts will adjudicate the same, because as to such rights, the church stands on the same plane with all other persons, and corporations, no higher, no lower; the law is over all. (*Post, pp.* 645-683.)

Cases cited and approved: Nance v. Busby, 91 Tenn., 303; Watson v. Jones, 13 Wall., 679; Bouldin v. Alexander, 15 Wall., 139; Bonacum v. Murphy, 71 Neb., 463; Hatfield v. De Long, 156 Ind., 207; Harmon v. Dreher, Speers, Eq. (S. C.), 87; Wheelock v. Church, 119 Cal., 477; Shannon v. Frost, 3 B. Mon. (Ky.), 253; People v. German, 3 Lans. (N. Y.), 442; State v. Hebrew Cong., 31 La. Ann., 205.

14. SAME. Property conveyed to trustees of a church creates a trust for the promulgation of its tenets and doctrines.

Property conveyed to trustees for the use of a church by its denominational name, or by its corporate name, if it be incorporated, creates a trust for the promulgation of the tenets and doctrines of that denomination, and hence land conveyed to the officers of the Cumberland Presbyterian Church at Fayetteville, Tennessee, and their successors in office for the use and benefit of that church did not pass to the members uniting with the Presbyterian Church in the United States of America on the attempted union of the two churches in 1906, but remained the property of the members of the congregation who continued to be members of the Cumberland Presbyterian Church, and held to its principles and doctrines, and remained truly identified therewith in doctrine, polity, and organic subordination. (*Post, pp.* 572, 573, 675-683.)

Landrith v. Hudgins.

Code cited and construed: Secs. 2563, 2564 (S.); secs. 2007, 2008 (M. & V.); sec. 1509 (T. & S. and 1858).

Cases cited and approved: Schnorr's Appeal, 67 Pa., 146; Roshi's Appeal, 69 Pa., 468; Miller v. Gable, 2 Denio (N. Y.), 548, 555, 556; Kniskern v. Churches, 1 Sandf. Ch., 439; 7 N. Y. Ch. Rep., 435, and note on page 437; Smith v. Pedigo, 145 Ind., 416; Hale v. Everett, 53 N. H., 9; Ferraria v. Vasconcelles, 23 Ill., 456.

FROM LINCOLN.

Appeal from the Chancery Court of Lincoln County.— WALTER S. BEARDEN, Chancellor.

J. M. GAUT, PARKS, BELL & MONTGOMERY, GEO. T. HUGHES, JOHN J. VERTREES, and JOHN H. DE WITT, for complainants.

W. C. CALDWELL, J. H. ZARECOR, J. J. McCLELLAN, CARTER, LAMB & LAMB, J. E. ROUTT, and J. H. FUSSELL, for defendants.

MR. JUSTICE NEIL delivered the opinion of the court.

The controversy in the present case arises out of certain transactions had between the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church, for the purpose of effecting a union between the two organizations.

The proceedings for union began in 1903, by a report of the committee of the general assembly of the Cumberland Presbyterian Church to the assembly. A committee was appointed at that meeting to consider the subject of union with the Presbyterian Church in the United States of America. This committee made a report to the assembly of 1904, in which it submitted what was termed a "Joint Report on Union," containing a basis of union. This report was received and spread upon the minutes, and the basis of union was by vote of the assembly—162 to 74—recommended to the presbyteries of the church for their approval or disapproval. At the assembly of 1905, a committee was appointed to canvass the returns from the presbyteries and report the result. The majority reported that sixty presbyteries of the one hundred and fourteen had voted approval, and fifty-one had voted disapproval, the remaining presbyteries not voting, and recommended that the assembly find and declare that a constitutional majority of the presbyteries had voted approval of the union, and that the basis of the union had been constitutionally adopted. There was a minority report. This report, while conceding that the presbyteries had voted in the manner just stated, made a summary of the vote, with the result that it appeared 691 ministers and 649 elders, making a total of 1340, voted for approval, and that 470 ministers and 1007 elders, total, 1,477, voted against approval. These same figures were also shown by Exhibit B to the majority report, and must be taken as true.

These facts however, could not of course, change the result of the vote of the presbyteries as organized bodies. Still, they show how deep and extended was the division of opinion in the church, upon the subject of union. The minority report also expressed an opinion adverse to the power of the assembly to enter into or confirm the union, and that such action was violative of the constitution of the church and therefore void. The majority report was adopted by a vote of 139 to 111.   Thereupon ninety-one members of the assembly filed a protest to the action taken.   In this protest they attacked the proceedings of the Assemblies of 1903 and 1904 as being unconstitutional, and charged that the basis of union contemplated the adoption of the Confession of Faith and ecclesiastical standards of the Presbyterian Church in the United States of America, and that the constitutional provision for this action of the church was not followed in the general reference; and that the Confession of Faith of the Cumberland Presbyterian Church could not be brought into harmony with the Westminster Confession of Faith adhered to by the Presbyterian Church in the United States of America by any method of construction; further, that the consummation of the union on such basis would not be in fact a union, but simply the merging of the Cumberland Presbyterian Church into the Presbyterian Church in the United States of America, and the extinguishment of the name and doctrines of the former.

The committee on fraternity and union was continued and enlarged, and was instructed to confer with a similar committee on the part of the Presbyterian Church in the United States of America with reference to adjusting the details of the union.

This committee reported to the assembly of 1906, sitting at Decatur, Ill. This report, after reciting the history of the movement for union during the sessions of 1903, 1904, and 1905, and the action taken in the Presbyterian Church in the United States of America concerning the same matter, suggested the following resolutions, viz.: That the effect of what had transpired was that the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and its other doctrinal and ecclesiastical standards, had been adopted by the Cumberland Presbyterian Church, in accordance with its constitution and in conformity with the basis of union; that the joint report, including the basis of union, and concurrent declarations and recommendations therein contained, had been adopted by the constituted authorities, and in accordance with the organic laws of both churches, and that the union so reached was binding, and would become fully effective after a certain declaration, presently to be mentioned, should be made; that immediately after the making of the declaration, the Confession of Faith, and other doctrinal and ecclesiastical standards of the Presbyterian Church in the United States of America, should become "effective and operative as to all ministers, elders, dea-

cons, officers, particular churches, judicatories, boards, committees, and all other ecclesiastical organizations, institutions, and agencies of the Cumberland Presbyterian Church"; that at the next election thereafter of delegates or commissioners, by the presbyteries—that is, for the year 1907—they should elect to the general assembly of the Presbyterian Church in the United States of America, according to the form of government of that church; and that all boards, committees, trustees, and other ecclesiastical agencies formerly required to report to the general assembly of the Cumberland Presbyterian Church should thereafter report to the general assembly of the Presbyterian Church in the United States of America.

The declaration referred to was contained in the fourteenth section of the report, and was, in substance, that upon the adoption of the joint report, including its recitals and resolutions, by the general assembly of each church, and upon reception of telegraphic notice of such adoption in each assembly from the other (one sitting at Decatur, Ill., and the other at Des Moines, Iowa), it would be the duty of the moderator of each assembly in behalf of his general assembly and church to declare, and publicly announce in open session of said assembly, the full consummation of the union in the following words: "The joint report of the two committees on reunion and union, and the recitals and resolutions therein contained and recommended for adoption, having been adopted by the general assembly of the Presbyterian

Church in the United States of America, and the general assembly of the Cumberland Presbyterian Church, and official notice of such adoption having been received by each of said general assemblies from the other, I do solemnly declare, and here publicly announce, that the basis of reunion and union is now in full force and effect, and that the Cumberland Presbyterian Church is now reunited with the Presbyterian Church in the United States of America as one church, and that the official records of the two churches during the period of separation shall be preserved and held as making up the history of the one church;" that after the making of this public declaration in the general assembly of the Cumberland Presbyterian Church, no business in that general assembly should be in order, except a motion to adjourn *sine die,* as a separate assembly.

This report was adopted by a report of 165 to 91; but the record sets out the names of twelve other commissioners who were absent when the vote was taken, and who would have voted in the negative had they been present, making one hundred and three dissentients.

Upon the adoption of the report, a protest was filed, signed by one hundred commissioners, making the following objections, viz.: That the assembly had no power to declare the Cumberland Presbyterian Church as a separate organization at an end, and to transfer the allegiance of the ministers, elders, deacons, officers, particular churches, judicatories, boards and committees to another organization of churches, and make them

Landrith v. Hudgins.

amenable to another church creed and constitution; that it had no power to declare that the Confession of Faith of the Presbyterian Church in the United States of America as revised in 1903, and its other doctrinal and ecclesiastical standards had been adopted in accordance with its constitution; that it had no power to direct the presbyteries of the Cumberland Presbyterian Church to send representatives to the general assembly of the Presbyterian Church in the United States of America.

After the filing of this protest, it was ordered, on motion, that a message by wire should be sent to the general assembly of the Presbyterian Church in the United States of America, in session at Des Moines, giving notice of the action taken on the report; and this was done and an adjournment had to 2:30 p. m. The general assembly of the latter church then sent a message that it had made the declaration above referred to. Thereupon a similar declaration was made in the general assembly of the Cumberland Presbyterian Church. An adjournment *sine die* was then taken, pursuant to the terms of section 14, supra, of this report.

The following appears in the record under the caption:

"From Supplemental Minutes General Assembly Cumberland Presbyterian Church, Afternoon Session, May 24, 1906.

MINUTES.

"DECATUR, ILL., May 24, 1906, 1:30 p. m.

"The assembly having been in session since it convened on Thursday, 17th inst., and having in that time adopted the joint report of the committee on fraternity and union between our church and the Presbyterian Church in the United States of America, the protest previously filed being disregarded, and the purpose of the majority to adjourn without day and without naming a place for another meeting being persisted in, they were informed on the floor of the assembly, before the adjournment actually took place, that the minority would treat the adjournment as illegal and ineffectual, and would continue the session of the general assembly thereafter. And immediately upon the announcement of the adjournment by the then presiding moderator, and before the unionists had dispersed, Commissioner J. H. Fussell, one of the loyalists, announced in a loud and distinct voice, within the hearing of both union and loyal commissioners then in the assembly hall, that the business of the general assembly would be resumed at once in the hall of the Grand Army of the Republic near by, the church house in which the previous part of the assembly's session was held having been refused by (to) the loyalists for that purpose. The loyalist commissioners, about one hundred in number in attendance, at this point in the proceedings, repaired to the hall indicated, and proceeded to the transaction of the business of the assembly."

. Thereupon a new moderator and stated clerk were elected (these officers of the assembly as previously constituted having gone into the union), and a resolution was introduced and passed declaring the former action of the assembly in respect of union unconstitutional and void, and "that the action and announcements aforesaid be and the same are hereby rescinded."

The concluding minute is: "On motion, the assembly adjourned to meet at the birthplace of the Cumberland Presbyterian Church in Dickson county, Tennessee, on the third Thursday of May, 1907, at 10:30 o'clock a. m."

The next minute entry of this body claiming to be the general assembly of the Cumberland Presbyterian Church is entitled: "Minutes of the Seventy-Seventh General Assemby of the Cumberland Presbyterian Church, held at Dickson, Tennessee, May 16th to 21st, 1907."

During this meeting an address was prepared and forwarded to the general assembly of the Presbyterian Church in the United States of America, in session at Columbus, Ohio, composed largely of protest and expostulation, in respect of claims put forward by the latter to the property of the Cumberland Presbyterian Church.

This address recited that the assembly at Dickson was composed of commissioners or representatives from seventy-six of the one hundred and fourteen of the presbyteries of the church; which we take to be true.

This body adjourned to meet at Corsicana, Tex., on the third Thursday in May, 1908.

It is thus perceived there is in existence a body, sitting upon its own adjournments, claiming to be the general assembly of the Cumberland Presbyterian Church; and to it are attached bodies claiming to be the majorities of the presbyteries.

As a consequence, there are divisions in many of the congregations of the church, one party asserting the validity of the union, and yielding allegiance to the Presbyterian Church in the United States of America, the other denying the validity of the union, and acknowledging allegiance to the body which still claims to be the General Assembly of the Cumberland Presbyterian Church and its constituent bodies claiming to be presbyteries.

The complainants, who are adherents of the Presbyterian Church in the United States of America, have filed the present bill claiming the church property at Fayetteville, in this State, consisting of the house of worship. The defendants, who are adherents of the other body which claims to be the Cumberland Presbyterian Church, insist that they are entitled to the property.

The property was conveyed in 1852 to trustees for the use and benefit of the Cumberland Presbyterian Church at Fayetteville.

The chancellor held adversely to the complainants, as to the property right, and they have appealed and assigned errors.

It is unnecessary to set out these assignments, or to notice them further than to say that in what follows the

substance of the whole controversy will be considered and disposed of.

The general insistence on the part of the complainants is that the two church organizations had the power to unite, and did unite, in accordance with their several constitutions, and that as a result the complainants are entitled to relief against the defendants who are holding the house of worship in controversy. The defendants insist that the constitution of the Cumberland Presbyterian Church was violated in certain essential particulars in the prosecution of the proceedings for union, and that, even if this difficulty could be overcome, the difference in doctrine is so great as to amount to a diversion of the church property above indicated from the trust to which it was originally devoted.

There is another general theory put forward by the defendants and pressed with great earnestness, as indeed are all their contentions, to this effect: It is insisted that what is called a union of the two churches is only a merger; that the Cumberland Presbyterian Church, according to the terms of the union, surrendered its name, its organization, and its system of faith to the Presbyterian Church in the United States of America; that the latter church simply absorbed the Cumberland Presbyterian Church; that the action attempted was revolutionary; that the framework, so to speak, of the Cumberland Presbyterian Church, consisting of what are called its several church courts—the session, the presbytery, the synod, and the general assembly—the found-

ers built to continue in perpetuity; that no power is discovered, or can be discovered, in any part of the constitution of the church, conferring authority on either of these courts, or on all of them together, to destroy the organization, or put an end to it in any form.

Connected with these various contentions are many subordinate questions which will have to be considered; and disposed of as we proceed.

We shall first consider whether the position is sound that the organization of the Cumberland Presbyterian Church was intended to be a perpetual thing, and for that reason there could never be a union which would involve a surrender of that organization.

This involves a construction of the contract expressed in the constitution of the church. But before going into this matter, there are certain general facts of history which we should bear in mind in order to get the point of view.

Considered broadly, one of the great facts standing out in the history of the Christian church is that, in its long life, many controversies as to doctrine and ceremonial have arisen, and there have been many divisions. While the apostles were yet alive a serious question arose concerning the necessity of continuing as a part of the Christian system a certain Jewish rite. It was a question so grave that it was carried for settlement to the Church at Jerusalem, and was there considered by the apostles and elders, and discussed and disposed of in the presence of the congregation. A decision was

Landrith v. Hudgins.

rendered which was transmitted, for the purpose of quieting the controversy, to all of the churches, to which it was deemed necessary to send it. Acts xv. In the succeeding centuries numerous controversies arose over matters of doctrine and discipline which were settled by church councils. By means of these councils serious divisions were prevented until the great Reformation of the sixteenth century, with the exception of the division between the Eastern and the Western churches, which occurred, A. D., 1054, as a result of controversies which had proceeded from time to time during several centuries.

Numerous efforts have been made in comparatively recent years by various branches of the Protestant division of the church for union among themselves. Many of these efforts have been made by organizations holding the Presbyterian system. It would lead us too far out of our way to insert here even a simple list of these.

The Cumberland Presbyterian Church had its origin on the 4th day of February, 1810, in a separation or secession of three ministers—Finis Ewing, Samuel King, and Samuel McAdow—from the Presbyterian Church. They organized an independent presbytery, calling it Cumberland Presbytery. This separation arose out of a difference of opinion upon certain doctrinal questions. From this small beginning the church continued to grow until at the meeting of its general assembly, in May, 1906, it had extended its influence and organization into numerous States. At the latter date, as shown by the

minutes of the general assembly, at that meeting the church had then 17 synods, 114 presbyteries, 1,514 ordained ministers, 9,614 ordained elders, 3,914 ordained deacons, 2,869 congregations, and a total membership of 185,212. Yet, notwithstanding this strong, independent growth, this church has, during its whole life, shown an earnest desire for Christian unity. In support of this statement we cite the following proposed unions, viz.: Cumberland Presbytery with the Synod of Kentucky, in 1810; Cumberland Presbytery with the West Tennessee Presbytery and Muhlenberg Presbytery, in 1811; a resolution expressing a desire for a union of the whole Presbyterian family, adopted in 1860; the Cumberland Presbyterian Church with the Presbyterian Church (South), in 1867; the Cumberland Presbyterian Church with the Presbyterian Church (North), in 1873; the Cumberland Presbyterian Church with the General Synod of the Evangelical Lutheran Church in the United States in 1882; the Cumberland Presbyterian Church with the general conference of the Methodist Protestant Church, in 1885.

These facts, and numerous instances of other unions in other church societies either effected or attempted, clearly indicate that denominational differences were not intended to be necessarily unending, and that independent organizations were not essentially designed for perpetuity.

In Christian thought, unity is more desirable than division. All denominational church organizations have

as their primary object the propagation of the Christian religion. The individual advancement of each separate organization is looked upon as a contribution that far to the general cause. A union with another church organization having the same purpose may be regarded, therefore, as a step forward in the consummation of the work in which all are engaged. For this reason, the general analogy of an ordinary secular corporation or association is misleading. The purpose of such an organization is self-aggrandizement, the advancement of its own interests, its increase in power, in wealth, in strength, without regard to any other organization, or to the prosperity or purposes of any other association of individuals. Such organizations have no common purpose, no common head, no invisible cords of union. Each stands alone. Each has property devoted to the special individual purposes of the society, and each has stockholders. A business corporation is organized for profit, and if its life is not limited by its charter, it is regarded as perpetual, unless sooner ended for breach of law or duty, or inability to discharge its functions. In case of a termination of corporate rights by efflux of time, or for either of the causes last mentioned, the business is wound up, the property is sold, and the proceeds, after payment of debts, if any, divided among the stockholders. But with church organizations, the case is different. They are not created for either profit or pleasure, but to do good. They have property, but not stock-

holders. The possessions of all the churches are devoted to the same broad, general purpose, likewise the efforts of all of their members acting within the organization. In the thought of Christians all over the world, the church is a unit, one and indivisible, the "body of Christ." Its various branches are but members of that one body. Its purpose is one and indivisible, the advancement of Christ's kingdom on earth and the subjection of all men to its sway—a dominion not of force, but of love. The great Napoleon, chained to the rock of St. Helena, when conversing, as was his habit, about the great men of the ancient world, and comparing himself with them, turned, it is said, to Count Montholon with the inquiry: "Can you tell me who Jesus Christ was?" The question was declined, and Napoleon proceeded: "Well, then, I will tell you. Alexander, Caesar, Charlemagne, and I myself have founded great empires; but upon what did these creations of our genius depend? Upon force. Jesus alone founded his empire upon love, and to this very day millions would die for him. . . . I think I understand something of human nature; and I will tell you, all these were men, and I am a man; none else is like him; Jesus Christ was more than man. . . . I have inspired multitudes with such an enthusiastic devotion that they would have died for me, . . . but to do this, it was necessary that I should be visibly present with the electric influence of my looks, of my words, of my voice. When I saw men and spoke to them, I lighted up the flame of self-devotion

in their hearts. . . . Christ alone has succeeded in so raising the mind of man towards the Unseen, that it becomes insensible to the barriers of time and space. Across a chasm of eighteen hundred years, Jesus Christ makes a demand which is beyond all others, difficult to satisfy; he asks for that which a philosopher may often seek in vain at the hands of his friends, or a father of his children, or a bride of her spouse, or a man of his brother. He asks for the human heart; he will have it entirely to himself. He demands it unconditionally; and forthwith his demand is granted. Wonderful! In defiance of time and space, the soul of man, with all its powers and faculties, becomes an annexation to the Empire of Christ. All who sincerely believe in him experience that remarkable supernatural love towards him. This phenomenon is unaccountable; it is altogether beyond the scope of man's creative powers. Time, the great destroyer, is powerless to extinguish this sacred flame; time can neither exhaust its strength or put a limit to its range. This is what strikes me most; I have often thought of it. This it is which proves to me quite convincingly the divinity of Jesus Christ." Cannon Liddon's Bampton Lectures, "The Divinity of Our Lord" (14th Ed.), p. 150 and note. Says Cannon Liddon: "It is of the essence of Christianity that, day by day, hour by hour, the Christian should live in conscious, felt, sustained relationship to the ever living author of his creed and of his life. Christianity is nonexistent apart from Christ; it centers in Christ; it radiates,

now as at the first, from Christ. It is not a mere doctrine bequeathed by him to a world with which he has ceased to have dealings; it perishes outright when men attempt to abstract it from the living Person of its Founder. He is felt by his people to be their living Lord, really present with them now, and even unto the end of the world." Id., p. 129. To the Christian conception his kingdom is the kingdom of light, and opposed is the kingdom of darkness; the two are in constant warfare. The Christian life is regarded as a continuing battle, a battle against the evil tendencies of each individual nature and a continuous warfare against the wickedness of the world. The effort is to overcome evil with good, by converting bad men into good men. This is the work of the church, this its unending warfare. In this war all Christians are enlisted—all branches of the one church are engaged. What should be thought of one who would admit that the cause for which all are fighting would be best served by the union of his particular church with another and larger branch, yet who would refuse to enter that union? What should be thought of the members of a regiment, a brigade, a corps, a division of an army that refused to coalesce with another regiment, brigade, corps, or division of the same army for the common good? Could any attachment, the deepest, to its particular organization, its history, its achievements, its associations, justify the subordination of the common cause?

In what has been said we have assumed that men

generally agree that united effort is the best for any cause. We have not considered the views of those who believe that the ultimate result is best served by working along individual lines through separate organizations, all converging to a common center. We have not considered as yet the views of those who, while believing that union is best, still cannot agree that proper and legal steps have been taken to effect that union. But we have not been unmindful that it is natural that efforts at union should always find opposition, not only by reason of differences of opinion as to the materiality of points of controversy, but also for reasons that have their springs deep in the human heart. It is the church of their fathers, and of their fathers' fathers. It is filled with memories. It is hallowed by griefs and endeared by loves. It has been the vestibule of heaven for parents long since gone hence; at her altars marriage vows have been plighted; here children have been dedicated to God, and here from Sabbath to Sabbath the messenger of God has pointed the way to heaven. And then there is the name, with all its noble heritage of achievement in the service of God and man. It is hard to feel that it shall perish from the earth, or stand only as a memory, or as representing a remnant of the strength it formerly stood for. Memories, feelings, emotions like these, do honor to human nature.

One of the greatest of men has expressed an opinion favorable to separateness. Milton, in the "Areopagitica," incidentally refers to the subject thus:

Landrith v. Hudgins.

, "Who knows not the Truth is strong next to the Almighty. . . . Yet is it not impossible that she may have more shapes than one. What else is all that rank of things indifferent, wherein Truth may be on this side, or on the other, without being unlike herself? What but a vain shadow else is the abolition of those ordinances, that handwriting nailed to the cross; what great purchase is this Christian liberty which Paul so often boasts of? His doctrine is, that he who eats or eats not, regards a day, or regards it not, may do either to the Lord. How many other things might be tolerated in peace, and left to conscience, had we but charity, and were it not the chief stronghold of our hypocrisy to be ever judging one another. . . . We stumble and are impatient at the least dividing of one visible congregation from another, though it be not in fundamentals; and through our forwardness to suppress, and our backwardness to recover any enthralled piece of truth out of the gripe of custom, we care not to keep Truth separated from Truth, which is the fiercest rent and disunion of all. We do not see that while we still affect by all means a rigid external formality, we may as soon fall again into a gross conforming stupidity, a stark and dead congealment of wood, and hay, and stubble forced and frozen together which is more to the certain degenerating of a church than many subdichotomies of petty schisms. Not that I can think well of every light separation, or that all in a church is to be expected gold and silver and precious stones; it is not

possible for man to sever the wheat from the tares, the good fish from the other fry; that must be the Angel's ministry at the end of mortal things. Yet, if all cannot be of one mind, as who looks they should be? this doubtless is more wholesome, more prudent, and more Christian that many be tolerated rather than all compelled . . . those neighboring differences, or rather indifferences, are what I speak of, whether in some point of doctrine or of discipline, which though they may be many, yet need not interrupt the unity of the spirit, if we could but find among us the bond of peace."

Still, the dominant belief in the Christian heart is that union is better than division. There must be in every church organization an implied or inherent power of union with other church organizations, growing out of the purpose for which all are constituted, viz., the dissemination of the Christian religion. If any two organizations reach the conclusion that they can better subserve this great and fundamental purpose by uniting with each other, and if they can agree, within their constitutional limits, upon the points of difference previously dividing them, there can be no reason, in law, why they should remain apart. There is no soundness in the view that church divisions once made must ever continue. If divisions in the Christian church were intended to be perpetual, then the argument for the defendants, on this head, is unanswerable; if there be such a thing as a universal church of which all the divisions are members or branches, if there be a tendency to unity

in Christendom, and if this tendency is in accord with the spirit and purpose of Christianity—then the argument referred to can avail but little.

From what has been previously said we are able to perceive that there is some plausibility, to say the least, in the theory that there is an implied power of union in all Christian organizations. We are enabled to understand the thought in the minds of the members of the Cumberland Presbyterian Church from the beginning until now, exhibited in the efforts for union made through so many years. We are enabled to understand why the overtures for union made through so many years by the general assembly of that church have not shocked its membership as a thing foreign to its purposes, why in fact it has always been considered a policy in harmony with the general purpose of its organization and work. The fact that these unions were not consummated because the negotiating parties could not agree upon terms is immaterial. The point is that these propositions and negotiations show that the church bodies making or entertaining them did not consider that they were intended to be, or ought to be, perpetual, but on the contrary that divisions ought to be healed. The pregnant and undeniable fact is that such negotiations indicate a belief in the possibility of union. For the purposes of this particular phase of the inquiry it is immaterial what propositions composed the terms offered or rejected or accepted as the case may be.

The fact that the matter of union was so often brought up and considered or that it was considered at all, is proof positive that those who had authority to speak for the Cumberland Presbyterian Church, and who uttered its voice believed that the power to effect a union existed; and the fact that it has been brought forward and considered at intervals, from the founding of the church to the present time, proves that this belief has long existed, has lived in the thought of the Cumberland people along with the life of the organization. This belief was based, either upon some power expressed in the standards of the church, or upon an implied power supposed to exist in the organization.

The power exists by implication. It exists from the very nature of the case, not only in the Cumberland organization, but in every other Christian society in whose standards there is not an explicit pronouncement to the contrary, because they are all parts of one whole, all engaged in the same work, seeking the same end, and animated by a common purpose.

But although the power to form a union exist, it must be exercised in accordance with the manner indicated by the constitution or constituent contract by which the organization is bound together. In order to determine where the power rests to carry out and make effective such a plan, we must consider the whole nature of the organization, as well as its construction of its own powers in this regard. And this involves a brief consideration of the Presbyterian system of government, and par-

ticularly that government as exhibited in the constitution of the Cumberland Presbyterian Church, which, however, does not materially diverge from the ordinary Presbyterian standard or system.

The Cumberland Presbyterian Church is a compact organization. Each individual congregation is bound to the presbytery over it by the fact that before it can become a Presbyterian congregation it must be received by the presbytery, and it cannot obtain a minister except by the consent of the presbytery, or make a contract with him; and when the contract is made by the consent of the presbytery, it cannot be dissolved except with like consent. There can be no doubt that if a congregation should refuse to obey this rule or law it would, during the continuance of such disobedience, be in a state of rebellion against lawfully constituted authority, and could be properly exscinded from the body of the church. There can be equally no doubt that if a minority of the congregation, in such a case, should be willing to submit to the authority of the presbytery, it would be recognized by the civil authorities as the true congregation, and would be entitled to the possession and use of the church property. This vital connection between each individual congregation and the presbytery, originating when the congregation is accepted by and received into the presbytery, is continued active and effective through the agency of the church session, by its delegate to the presbytery. The church session so far as composed of elders, is created by the voice of the

people who compose the congregation; and by the combined voice of the presbytery, the session, and the people, the minister is attached to the congregation. Thus the session, composed of the elders and the minister, is created by the joint action of the individual congregation, and the presbytery. The congregation is represented in the presbytery by an elder whom the session elects to that body. The session is the governing agency of the congregation. So far as it may be thought necessary, upon any subject, to obtain the voice or know the will of the congregation, this is accomplished by the session bringing the matter before the congregation, and in some proper form obtaining the sense of that body. The session instructs its representative accordingly, or may instruct without referring the matter to the congregation. There is no other method known to Presbyterian practice for taking the voice of the congregation. Suppose a direct vote should be taken by several congregations upon the subject of union with another organization, or upon any other subject. Could the result be made known, or, in Presbyterian practice, would it be made known, in any other way, and rendered effective, than by a request to the session to send a delegate to the presbytery who would represent the view expressed by the congregation? No. Suppose any proposition of a general nature affecting the whole church, should be pending before each congregation of the church, and a vote should be taken on it in each one, would not the vote be taken by the

session? If not so taken, it would have to be taken by some one constituted as chairman or moderator of the meeting. Let us suppose the vote taken either way. To whom would the result be certified? One of two courses would have to be followed; either the vote would have to be certified to the presbytery and through it to the general assembly, or each church would have to stand upon its own vote as a finality, and say in effect: "The majority of this congregation having voted against the proposition we will have none of it, regardless of what our sister congregations may do." This position would be recognized at once as a secession from the Presbyterian organization since that organization is one of associated churches, all linked together by a chain of constituent organizations, each joined to a presbytery, and each presbytery, and all the presbyteries, joined to the general assembly, the common bond of union between all the churches and church courts. Each individual church (congregation) is, as it were, a link in a section of chain; this section of chain is welded as it were into the larger link—the presbytery; and all the presbyteries linked together forming a larger chain—the general assembly; so that every link, even to the smallest is connected with every other link.

We have supposed a general question pending before each of the individual congregations of the Cumberland Presbyterian Church, and a vote taken. We have seen that if they conform to the Presbyterian system they must make return through the session to the presbytery

and through the latter to the general assembly; that any
other course would be a repudiation of the system and
a rebellion against constituted authority.   Now we shall
consider how could such general question be proposed
to the individual congregations.   The answer is, by some
central authority.   What central authority is there other
than the general assembly?   None.   That body then
must propose any general question affecting the whole
church which the several congregations are to consider.
In practice, how is this done?   The answer is, by a ref-
erence to the presbyteries.   How do the presbyteries
learn the mind of the people who make up the individual
congregation?   They do so by the vote of the represen-
tative of that congregation sent to the presbytery from
the session of that church or congregation.   Does the
presbytery take note of the vote of the congregation,
or inquire whether there was a vote taken or not?   No;
it is presumed that the elders representing the congrega-
tions, and the pastors or ministers, know the wishes of
the majority, and truly speak the voice of that majority
—in other words, that they truly represent the wishes
of the congregations.   Such is the course that must be
pursued on any general question that can be lawfully
submitted to all of the congregations.   If the question
of union with another denomination can be submitted
at all, it can be submitted only in this way.   It cannot
be submitted to a general *per capita* vote of all the con-
gregations and he decided by the greater number of
heads.   The Presbyterian system does not contemplate

or permit such a vote on any question whatever. If we suppose a case in which it is made to appear that there is an agitation extending over all the congregations, produced by the efforts of religious speakers, and the sentiments of the denominational press, and that spontaneously, as it were, without the action of any central authority, each congregation should be organized into a church or business meeting, presided over by a moderator, or chairman, and that a vote thus should be taken on the general question so agitated, that vote would not be in accordance with Presbyterian form, and would be a nullity, if any minority whatever should remain as representing the organization. It could be made effective only by unanimous resolution. This would be true as to any general question whatever which might be submitted or considered. It would be true as to the question of union. Therefore, if that question could not be submitted in the form in which it was submitted, that is for vote of the presbyteries, it could not be submitted at all.

In the constitution of the church we find it laid down: "A particular church consists of a number of professing Christians voluntarily associated together for divine worship and godly living, agreeably to the Holy Scriptures and submitting to a certain form of government. Its officers are the minister in charge, the ruling elders and the deacons. Its jurisdiction is lodged in the church session, composed of the minister in charge and ruling elders (section 4). The church session consists of the

minister in charge and two or more ruling elders of a particular church (section 26). A presbytery consists of all the ordained ministers and one ruling elder from each church, within a certain district (section 29). The synod consists of all the ministers and one ruling elder from each church in a district comprising at least three presbyteries (section 35). The general assembly is the highest court of the church, and represents, in one body, all the particular churches thereof. It bears the title of the General Assembly of the Cumberland Presbyterian Church, and constitutes the bond of union, peace, correspondence, and mutual confidence among all its churches and courts (section 40). The general assembly shall meet as often as once every two years at such time and place as may have been determined at its preceding meeting, and shall consist of commissioners from the presbyteries in the following proportion: Every presbytery shall be entitled to send one minister and one ruling elder; but if it consists of eighteen or more ministerial members it may send an additional minister and ruling elder." Sections 40, 41.

Here we have the regular grades of the church judicatories in their order from the least to the highest, and the elements of which they are constituted. It should be noted that in reference to a particular church, among other things, that its constitution requires it to submit "to a certain form of government," and that "its jurisdiction is lodged in the church session."

Thus it is seen the "jurisdiction" in each particular church is lodged in the church session, not in the members at large. By "jurisdiction" is meant the power of government; that part of the sovereignty, so to speak, of the whole which belongs to each particular church organization.

We have seen that this body is composed of the elders of the particular church and the minister in charge. It is also seen that the next body immediately superior to the session is composed of all of the ordained ministers and one ruling elder from each church, within a certain district. It is to be noted that the governing body (the session) of each particular church within the district referred to selects one of its members, and delegates him to represent the church in the presbytery, and that this body is thus composed of these delegates and of the ministers, the latter of whom do not really represent any particular church, but the church at large. The synod is composed in the same manner as a presbytery, only comprising a larger territory, a territory equal to that of three presbyteries. The general assembly is made up of representatives sent by the presbyteries, called commissioners, both lay and ministerial; the lay commissioners, elders, being elected by the presbyteries, also the ministerial. The ministers are permanent members of presbyteries, and are not considered as members of any particular church, although of course they must have belonged to some particular congregation before they became ministers. The general assem-

bly, then, is made up of representatives of the people—
that is, elders; and representatives of the church at
large—that is, ministers.  Thus it is composed of all
governing agencies.  The sovereignty of the organiza-
tion, however, does not reside in that body alone, or in
the presbyteries, but in it and the presbyteries.  Each
acting alone is limited to powers expressly given (Const.,
sec. 25).  When they act together, the whole governing
body acts—the church at large, and the people them-
selves in and through their elders who are the repre-
sentatives of each several church.  The power which
makes or amends the constitution, or constituent con-
tract of the organization, is the power where sovereignty
is lodged.  This power is that of the general assembly
and the presbyteries acting together.  This was shown
by the manner in which the constitution of the Cum-
berland Presbyterian Church was adopted in 1883.  In
the case referred to, the people did not vote.  The power
that can constitute can dissolve, or can carry the or-
ganization into the body of another organization.  Per-
sons who become members of a church with this form
of organization agree by so doing to abide the powers
vested in the organization.

It may be for the good of the church, under some
circumstances that may be conceived, to dissolve the
organization, or to unite with another church on such
terms as may be agreed upon.  Such union may involve
a change of name, or faith, or both.  The constituent

121 Tenn—38

contract, the constitution, may point out how both of these ends may be effected, and, if so, must be complied with. After these changes have been made there may still remain the organization—the framework of the church which must, in effect, be dissolved, by the act of union with another church. The authority to effect this must be found where the supreme legislative power of the organization resides, because it requires the exercise of the will, and the expression of the will of the whole organization as a unit, on a proposition affecting the whole in respect of its existence and organic activity. There being a question for the whole church, it cannot be a matter to be determined by the individual congregation. The whole church itself is a unit—a composite unit, it is true, but still a unit—and in determining questions addressed to it, it must act in accordance with its nature, by that body or bodies through which it speaks its will.

The union must be effected in strict accord with the constitution; that is, if it requires a preliminary change of faith and of name, and these changes can only be made by amendment, then such amendment must precede the actual union, and must be made in the manner pointed out in the contract. The principle is that as far as the method is distinctly pointed out, it should be pursued.

We think it is within the just expectation of persons belonging to the different church organizations proposing a union that there shall already exist a substantial

Landrith v. Hudgins.

agreement between the two bodies proposing to unite, as to faith and form, or that before union takes place such agreement shall be reached; that if this agreement involves a change of the standards of faith of either party that change shall be effected in the manner provided by the constituent contract or constitution and laws of the church. In determining this phase of the question no consideration of inherent power can enter, if a particular method of change be indicated in the aforesaid constituent contract or constitution. The mention of the particular manner by which the change shall be effected excludes every other. It is but a compliance with the just expectation of the parties that the method they have agreed upon in advance shall be followed. In so holding, we do nothing more than yield obedience to the rule that every contract should be administered in the sense in which both parties understood it at the time it was entered into.

Now to apply these principles: If by what was done, it was intended to amend the Confession of Faith and Catechism of the Cumberland Presbyterian Church, or if what was done was tantamount to an amendment, it could not stand as such, if the provisions of section 60 (infra) of the constitution were not complied with. The civil court would not be justified in holding that some other way was just as good. We believe this is the sound view, and cannot concur in what is said on the same subject in some of the cases cited by counsel.

One of the counsel for complainants sets forth in his

argument a theory of sovereignty in the organization to the effect that the organization could exercise power simply by an act negativing the rule for amendment set forth in section 60. This theory is erroneous, when the matter is viewed from the standpoint from which a civil tribunal must examine it; because the provisions of section 60 constituted a part of the contract which the members of the church had the right to rely on, and could not be disregarded by mere negative action without the violation of an obligation to such members. They had the right to have this special matter called to the attention of the presbyteries, to have it submitted under the conditions stated in section 60, and to have it voted upon by the presbyteries, with all the preliminary agitation and discussion which such an expected vote would bring in its train.

It is true that the general assembly and the presbyteries under the power of amendment granted by the constitution may change the faith and the name of the Cumberland Presbyterian Church, but this might be done, and still, with its machinery intact, its framework of organization, it would remain an organization separate and distinct from all others.

Having determined that the Cumberland Presbyterian Church had power to effect a union with the Presbyterian Church in the United States of America, and that the proper method of effecting it was through a submission of the plan of union to the presbyteries by the general assembly and a subsequent declaration of the re-

sult by the general assembly, the next question that occurs is whether the whole plan was in fact submitted to the presbyteries or only a part of it.

We may here pause to remark that since, under the Presbyterian system, the members of the church have no direct voice in the matter, but it must be determined by the presbyteries for them, it is extremely important that there should be a full and fair submission of the whole matter to the presbyteries. The presbyteries are the fountains of power, and from them must flow, if from any source, the authority for effective union.

From the "Plan of Reunion and Union" of the two churches and the "Joint Report on Reunion and Union," made to the general assembly of 1906, two facts are apparent. The first of these is that the Presbyterian Church in the United States of America preserved intact its name, creed, and organization. This further appears from a report of the committee of the Presbyterian Church in the United States of America to its general assembly in 1906, stating, among other things, that: "The counsel of the board located in New York advised that particular care to be taken in the framing of the resolutions completing the reunion and union, so as to make it clear that the Presbyterian Church in the United States of America would continue its existence both ecclesiastically and legally, and that the Cumberland Presbyterian Church was reunited with, and incorporated into, said Presbyterian Church in the United States of America. . . . Further, it has been distinctly understood

in all the joint meetings of the two committees on re-
union and union . . . that the continued ecclesiastical
and legal existence of the Presbyterian Church in the
United States of America was, and is, fundamental to
the reunion, and that the reunited church would be the
Presbyterian Church in the United States of America,
which existed in 1799, 1836, 1870, and 1903.  It is be-
lieved that the continued ecclesiastical and legal exis-
tence of the Presbyterian Church in the United States
of America has been acknowledged and secured by the
resolutions of the joint report."

The second fact apparent from the said plan and the
said joint report is that the Cumberland Presbyterian
Church surrendered its name, its creed, and its organi-
zation, and became absorbed into the Presbyterian
Church in the United States of America.  This distinct-
ly appears from the first subdivision of the plan; also
from the following which appears in the joint report,
viz., that immediately after the declaration provided for
in the fourteenth section of the report, the Confession
of Faith and other doctrinal and ecclesiastical standards
of the Presbyterian Church in the United States of Amer-
ica shall become effective and operative as to all the min-
isters, elders, deacons, officers, particular churches, ju-
dicatories, boards, committees, and all other ecclesias-
tical organizations, institutions, and agencies of the
Cumberland Presbyterian Church; that the general as-
sembly of 1906 of the Cumberland Presbyterian Church
shall adjourn *sine die;* that the boards, committees, trus-

tees, and other ecclesiastical or corporate agencies connected with the said general assembly which had been theretofore directed, or should thereafter be directed, to report to the general assembly of the Presbyterian Church in the United States of America or were in duty bound to report to that general assembly, were authorized and empowered, if, and when, so directed by the general assembly of the Presbyterian Church in the United States of America to proceed according to law to orderly dissolution, in order that the funds, property, and other assets, by them, or any of them, held, should be turned over to such appropriate corporate agencies, whether boards, or committees, as should be permanently continued by the general assembly of the Presbyterian Church in the United States of America; and that such agencies, so permanently continued were intended to be substituted as trustees to succeed to the administration of such trust funds as well as thereafter to receive and distribute the benevolent offerings of all the churches and congregations theretofore belonging to either church; also that upon the declaration provided for in section 14, the synods, presbyteries, sessions, ministers, and congregations before connected with the Cumberland Presbyterian Church would thereby have been received into, and become incorporated with, the Presbyterian Church in the United States of America; that the stated clerk of the general assembly of the Presbyterian Church in the United States of America, with the assistance of the

stated clerk of the general assembly of the Cumberland Presbyterian Church, should be, and was, thereby authorized and directed to place the name of the synods and presbyteries connected with the Cumberland Presbyterian Church at the time of the completion of the union, on the roll of the synods and presbyteries of the general assembly of the Presbyterian Church in the United States of America.

The only part of the plan of the union submitted to the presbyteries of the Cumberland Presbyterian Church was embraced in the following question to which they were required to return a categorical answer of either approval or disapproval:

"Do you approve of the reunion and union of the Presbyterian Church in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired Word of God, the only infallible rule of faith and practice?"

This embraced only the matter of doctrine which fell within the second subdivision of the "Plan."

The first subdivision of the plan which involved a surrender of the name and organization of the Cumberland Presbyterian Church was not submitted to the presbyteries; but was left to be determined, and was de-

termined, by the general assemblies of the two churches; or rather by the general assembly of the Cumberland Presbyterian Church.   The question did not arise in the Presbyterian Church in the United States of America, because under the plan of union that church was to retain both its name and organization.

Did the general assembly of the Cumberland Presbyterian Church, without submitting the matter to the presbyteries have the power to surrender the name and organization of the church, and dissolve it, by consenting to its absorption into another organization?   The view entertained by the two general assemblies, it seems from the recitals and resolutions contained in the joint report, was that it was not necessary to submit the general plan to the presbyteries, or rather, that by submitting the question whether the union should be made on the basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, the whole plan was submitted.  Indeed, from a letter which the moderator and stated clerk of the Cumberland Presbyterian general assembly wrote to the presbyteries, it appears that they signified to these bodies that their vote on these questions would mean the "acceptance or rejection of the entire plan."   It is provided in the plan of union that each of the assemblies shall submit the basis of union to its presbyteries, to express their approval or disapproval, by a categorical answer to this question, setting forth the doctrinal question copied herein, concerning the adoption of the Con-

fession of Faith of the Presbyterian Church in the United States of America. That is, while the plan consisted of two distinct parts—the matter of doctrine, and the matter of dissolving the organization of the Cumberland Presbyterian Church and its absorption into the Presbyterian Church in the United States of America—only the question of doctrine was ordered to be submitted to the presbyteries, and their answer to this was to be regarded, according to the plan, as an answer to the other; in other words, only a part of the plan was to be submitted to the presbyteries, but this submission was to be regarded as a submission of the whole. So, passing the statement above copied from the letter of the moderator and the stated clerk to the presbyteries as to what effect of their vote would be as expressing merely their opinion, which, of course, was not binding on the presbyteries, or upon the court, because it does not appear that they had any authority to make such statement, but were merely required by the resolution of the assembly to submit the basis of union to the presbyteries, and also because the question is one for this court to determine, we must consider the question as one arising upon the basis of union itself—whether the submission of the single question referred to (the doctrinal basis) was also a submission of the other, concerning the surrender of the name of the church, and the breaking up and dissolution of its organization. The question asked the presbyteries was: "Do you approve of the reunion and union of the Presbyterian Church

in the United States of America and the Cumberland Presbyterian Church on the following basis: The union shall be effected on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and ecclesiastical standards; and the Scriptures of the Old and New Testaments shall be acknowledged as the inspired Word of God, the only infallible rule of faith and practice?" Was that equivalent to asking the presbyteries to vote upon the proposition involved in the first section of the plan, that the Cumberland Presbyterian Church should surrender its name and organization, and be incorporated into the body of the Presbyterian Church in the United States of America, and under the name of the latter? Does the submission of the question, "Are you willing to effect a union upon a certain doctrinal basis?" also submit the question, "Are you willing that the Cumberland Presbyterian Church shall abandon its name and organization and be merged into the Presbyterian Church in the United States of America?" We think not. Perhaps this might be true as a necessary implication, if merger were the only form of union, but it is by no means the only form. At all events, the people of the church were entitled to have the whole question submitted to the presbyteries. We do not think that the general assembly had power to determine this question without a submission to the presbyteries. There is nothing in any part of the constitution of the church which confers this

power upon the assembly, and by section 25 that body is denied all powers not expressly conferred. We have found in a previous part of the discussion that the power rests, if anywhere, in the presbyteries, not as the result of any provisions in respect of them set forth in the terms of the constitution, but inherently in them as the core of the Presbyterian system, or as the fountain from which all powers issue.

The next question to be determined is whether there is any substantial difference between the Confession of Faith and other standards of the Presbyterian Church in the United States of America and those of the Cumberland Presbyterian Church, as they existed at the time the proceedings for union were had.

The controversy between the Presbyterian Church and the Cumberland Presbyterian Church has always rested mainly upon what is known in the Presbyterian system as the doctrine of the "Divine Decree." This doctrine is set forth in the third chapter of the Presbyterian Confession of Faith as follows:

"OF GOD'S ETERNAL DECREE.

"Section 1.  God, from all eternity did, by the most wise and holy counsel of his own will, freely and unchangeably ordain whatever comes to pass; yet so as thereby neither is God the author of sin, nor is violence offered to the will of the creature, nor is the liberty or contingency of second causes taken away, but rather established.

Landrith v. Hudgins.

"Sec. 2. Although God knows whatsoever may or can come to pass upon all supposed conditions, yet hath he not decreed anything because he foresaw it as future, or as that which would come to pass upon such conditions.

"Sec. 3. By the decree of God for the manifestation of his glory, some men and angels are predestinated unto everlasting life, and others fore-ordained to everlasting death.

"Sec. 4. These angels and men, thus predestinated and fore-ordained, are particularly and unchangeably designed, and their number is so certain and definite, that it cannot be either increased or diminished.

"Sec. 5. Those of mankind that are predestinated unto life, God, before the foundation of the world was laid, according to his eternal and immutable purpose, and the secret counsel and good pleasure of his will hath chosen in Christ unto everlasting glory, out of his mere free grace and love, without any foresight of faith or good works, or perseverance in either of them, or any other thing in the creature, as conditions, or causes moving him thereunto; and all to the praise of his glorious grace.

"Sec. 6. As God hath appointed the elect unto glory, so hath he, by the eternal and most free purpose of his will, fore-ordained all the means thereunto. Wherefore they who are elected being fallen in Adam, are redeemed by Christ; are effectually called unto faith in Christ by his spirit working in due season; are justified, adopted, sanctified and kept by his power through

faith unto salvation. Neither are any other redeemed by Christ, effectually called, justified, adopted, sanctified, and saved, but the elect only.

"Sec. 7. The rest of mankind, God was pleased, according to the unsearchable counsel of his own will, whereby he extendeth or withholdeth mercy as he pleaseth, for the glory of his sovereign power over his creatures, to pass by, and to ordain them to dishonor and wrath for their sins, to the praise of his glorious justice.

"Sec. 8. The doctrine of this high mystery, of predestination, is to be handled with special prudence and care, that men attending the will of God revealed in his word, and yielding obedience thereunto, may, from the certainty of their effectual vocation, be assured of their eternal election. So shall this doctrine afford matter of praise, reverence and admiration of God, and of humility, diligence and abundant consolation to all that sincerely obey the gospel."

## "CHAPTER 10.

### "OF EFFECTUAL CALLING.

"Section 1. All those whom God hath predestinated unto life, and those only he is pleased, in his appointed and accepted time, effectually to call, by his word and spirit, out of .that state of sin and death in which they are by nature, to grace and salvation by Jesus Christ; enlightening their minds spiritually and savingly to understand the things of God; taking away their heart of

stone, and giving unto them an heart of flesh; renewing their wills, and by his almighty power determining them to that which is good, and effectually drawing them to Jesus Christ; yet so as they come most freely, being made willing by his grace.

"Sec. 2. This effectual call is of God's free and special grace alone, not from anything at all foreseen in man, who is altogether passive therein, until, being quickened and renewed by the Holy Spirit, he is thereby enabled to answer this call, and to embrace the grace offered and conveyed in it.

"Sec. 3. Elect infants, dying in infancy, are regenerated and saved by Christ through the spirit, who worketh when and where and how he pleaseth. So also are all other elect persons who are incapable of being outwardly called by the ministry of the word.

"Sec. 4. Others not elected, although they may be called by the ministry of the word, and may have some common operations of the spirit; yet they never truly come unto Christ, and therefore cannot be saved; much less can men not professing the Christian religion be saved in any other way whatsoever, be they ever so diligent to frame their lives according to the light of nature and the law of that religion they do profess; and to assert and maintain that they may, is very pernicious, and to be detested."

In 1903 the following, known as "The Declaratory Statement," was added as a foot-note to chapter 3 and to chapter 10, section 3, viz.:

"While the ordination vow of ministers, ruling elders, and deacons as set forth in the Form of Government requires the reception and adoption of the Confession of Faith only as containing the system of doctrine taught in the Holy Scriptures, nevertheless, seeing that the desire has been formally expressed, for a disavowal by the church of certain inferences drawn from statements in the Confession of Faith, and also for a declaration of certain aspects of revealed truth, which appear at the present time to call for more explicit statement, therefore the Presbyterian Church in the United States of America does authoritatively declare as follows:

"First. With reference to chapter 3 of the Confession of Faith: That concerning those who are saved in Christ, the doctrine of God's eternal decree is held in harmony with the doctrine of his love to all mankind, his gift of his Son to be the propitiation for the sins of the whole world, and his readiness to bestow his saving grace on all who seek it. That concerning those who perish, the doctrine of God's eternal decree is held in harmony with the doctrine that God desires not the death of any sinner; but hath provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the Gospel to all; that men are fully responsible for their treatment of God's gracious offer; that his decree hinders no man from accepting that offer; and that no man is condemned except on the ground of his sin.

"Second. With reference to chapter 10, section 3, of

the Confession of Faith, that it is not to be regarded as teaching that any who die in infancy are lost. We believe that all dying in infancy are included in the election of grace, and are regenerated and saved by Christ through the spirit who works when and where and how he pleaseth."

## "CHAPTER 8.

### "OF CHRIST THE MEDIATOR.

"5. The Lord Jesus, by his perfect obedience, and sacrifice of himself, which he, through the Eternal Spirit, once offered up unto God, hath fully satisfied the justice of his Father; and purchased not only reconciliation, but an everlasting inheritance in the kingdom of heaven for all those whom the Father hath given unto him."

"8. To all those for whom Christ hath purchased redemption, he doth certainly and effectually apply and communicate the same; making intercession for them, and revealing unto them in and by the Word the mysteries of salvation; effectually persuading them by his Spirit to believe and obey; and governing their hearts by his Word and Spirit; overcoming all their enemies by his almighty power and wisdom, in such manner and ways as are most consonant to his wonderful and unsearchable dispensation."

## "CHAPTER 11.

### "OF JUSTIFICATION.

"Section 1. Those whom God effectually calleth, he also freely justifieth, not by infusing righteousness into
121 Tenn—39

them, but by pardoning their sins and by accounting and accepting their persons as righteous; not for anything wrought in them or done by them, but for Christ's sake alone; not by imputing faith in itself, the act of believing, or any other evangelical obedience to them as their righteousness; but by imputing the obedience and satisfaction of Christ unto them, they receiving and resting on him and his righteousness by faith; which faith they have not of themselves; it is the gift of God. . . .

"Sec. 4.    God did, from all eternity, decree to justify all the elect; and Christ did, in the fullness of time, die for their sins, and rise again for their justification. Nevertheless they are not justified until the Holy Spirit doth in due time actually apply Christ unto them."

## "CHAPTER 13.

### "OF SANCTIFICATION.

"Section   1.   They who are effectually called and regenerated, having a new heart and a new spirit created in them, are further sanctified really and personally, through the virtue of Christ's death and resurrection, by his Word and Spirit dwelling in them.   .   .   .

## "CHAPTER 14.

### "OF SAVING FAITH.

"Section   1.   The grace of faith, whereby the elect are enabled to believe to the saving of their souls, is the work

of the spirit of Christ in their hearts, and is ordinarily wrought by the ministry of the Word; by which also, and by the administration of the sacraments and prayer, it is increased and strengthened."

"CHAPTER 17.

"OF THE PERSEVERANCE OF THE SAINTS.

"Section 1.   They whom God hath accepted in his beloved, effectually called and sanctified by his spirit, can neither totally nor finally fall away from the state of grace; but shall certainly persevere to the end, and be eternally saved.

"Sec. 2.   This perseverance of the saints depends not upon their own free will, but upon the immutability of the decree of election, flowing from the free and unchangeable love of God the Father; upon the efficacy of the merit and intercession of Jesus Christ; of the abiding of the Spirit, and of the seed of God within them; and the nature of the covenant of grace; from all which arise also the certainty and infallibility thereof."

Two new chapters were added to the Confession of Faith in 1903, introduced by the following preamble:

"Whereas, it is desirable to express more fully the doctrine of the Church concerning the Holy Spirit, missions and the love of God for all men, the following chapters were added to the Confession of Faith:

## "CHAPTER 34.

### "OF THE HOLY SPIRIT.

"1. The Holy Spirit, the third person in the Trinity, proceeding from the Father and the Son, of the same substance and equal in power and glory, is, together with the Father and Son, to be believed in, loved, obeyed, and worshipped throughout all ages.

" 2. He is the Lord and Giver of life, everywhere present in nature, and is the source of all good thought, pure desires, and holy counsels in men. By him the Prophets were moved to speak the Word of God, and all writers of the Holy Scriptures inspired to record infallibly the mind and will of God. The dispensation of the Gospel is especially committed to him. He prepares the way for it, accompanies it with his persuasive power, and urgeth its message upon the reason and conscience of men, so that they who reject its merciful offer are not only without excuse, but are also guilty of resisting the Holy Spirit.

" 3. The Holy Spirit, whom the Father is ever willing to give to all who ask him, is the only efficient agent in the application of redemption. ·He convicts men of sin, moves them to repentance, regenerates them by his grace, and persuades and enables them to embrace Jesus Christ by faith. He unites all believers to Christ, dwells in them as their Comforter and Sanctifier, gives to them the spirit of adoption and prayer, and performs all those gracious offices by which they are sanctified and sealed unto the day of redemption.

" 4. By the indwelling of the Holy Spirit all be-

lievers being vitally united to Christ, who is the Head, are thus united to one another in the Church which is his body.    He calls and anoints ministers for their holy office, qualifies all other officers in the church for their special work, and imparts various gifts and graces to its members.    He gives efficiency to the word and to the ordinances of the Gospel.    By him the Church will be preserved, and increased until it shall cover the earth, purified, and at last made perfectly holy in the presence of God.

### "CHAPTER 35.

#### "OF THE LOVE OF GOD AND MISSIONS.

"1.    God, in infinite and perfect love, having provided in the covenant of grace, through the mediation and sacrifice of the Lord Jesus Christ, a way of life and salvation, sufficient for and adapted to the whole lost race of man, doth freely offer this salvation to all men in the Gospel.

"2.    In the Gospel God declares his love for the world and his desire that all men should be saved, reveals fully and clearly the only way of salvation; promises eternal life to all who truly repent and believe in Christ; invites and commands all to embrace the offered message; and by his Spirit accompanying the word pleads with men to accept his gracious invitation.

"3.    It is the duty and privilege of every one who hears the Gospel immediately to accept his merciful provisions; and they who continue, in impenitence and unbelief incur aggravated guilt, and perish by their own fault.

"4.  Since there is no other way for salvation· than that revealed in the Gospel, and since in the divinely established and ordinary method of grace faith cometh by hearing the word of God, Christ hath commissioned his church to go into all the world and make disciples of all nations.  All believers are, therefore, under obligation to sustain the ordinances of religion where they are already established, and to contribute by their prayers, gifts, and personal efforts, to the extension of the Kingdom of Christ throughout the whole earth."

The Confession of Faith of the Cumberland Presbyterian Church is not divided into chapters, but into sections merely; these sections, however, are grouped under certain general heads.

In this latter Confession of Faith, under the subject of "Decrees of God," we find the following:

"DECREES OF GOD.

"8.  God, for the manifestation of His glory and goodness, by the most wise and holy counsel of His own will, freely and unchangeably ordained or determined what He himself would do, what He would require His intelligent creatures to do, and what should be the award, respectively, of the obedient and disobedient.

"9.  Though all divine decrees may not be revealed to men, yet it is certain that God has decreed nothing contrary to His revealed will or written words."

On the subject of freewill we find the following:

Landrith v. Hudgins.

"Freewill.

"34.  God, in creating man in His own likeness, endued him with intelligence, sensibility, and will, which form the basis of moral character, and render man capable of moral government.

"35.  The freedom of the will is a fact of human consciousness, and is the sole ground of human accountability.  Man, in his state of innocence, was both free and able to keep the divine law, also to violate it.  Without any constraint, from either physical or moral causes, he did violate it."

On the subject of the Divine Decrees, we find the following in the Cumberland Presbyterian Catechism:

"7.  What are the Decrees of God?

"The Decrees of God are His wise and holy purposes to do what shall be for His glory.  Sin not being for His glory, therefore He hath not decreed it."

In the Catechisms of the Presbyterian Church in the United States of America, we find the following, on the same subject:

"The Larger Catechism.

"Q.  12.  What are the Decrees of God?

"A.  God's Decrees are the wise, free and holy acts of the counsel of His will, whereby, from all eternity He hath, for His own glory, unchangeably foreordained whatsoever comes to pass in time, especially concerning angels and men.

"Q.  13.  What hath God especially decreed concerning angels and men?

"A.   God, by an eternal and immutable decree, out of His mere love, for the praise of His glorious grace, to be manifested in due time, hath elected some angels to glory; and in Christ hath chosen some men to eternal life, and the means thereof; and also, according to His sovereign power, and the unsearchable counsel of His own will (whereby He extendeth or withholdeth favor as He pleaseth), hath passed by, and foreordained the rest to dishonor and wrath, to be for their sin inflicted to the praise of the glory of His justice."

"THE SHORTER CATECHISM.

"Q.   7.   What are the Decrees of God?

"A.   The Decrees of God are His eternal purpose according to the counsel of His will, whereby, for His own glory, He hath foreordained whatsoever comes to pass."

On the subject of the Divine Influence, which covers the same matter intended to be covered in the Westminster Confession under the heading "Of Effectual Calling," in that Confession, we find, in contrast, the following in the Cumberland Presbyterian Confession:

"DIVINE INFLUENCE.

"38.   God the Father, having set forth His Son Jesus Christ as a propitiation for the sins of the world, does most graciously vouchsafe a manifestation of the Holy Spirit with the same intent to every man.

"39.   The Holy Spirit, operating through the written word and through such other means as God in His wisdom may choose, or directly, without means, so moves upon the hearts of men as to enlighten, reprove, and con-

vince them of sin, of their lost estate, and of their need of salvation; and, by so doing inclines them to come to Christ.

"40. This call of the Holy Spirit is purely of God's free grace alone, and not because of human merit, and is antecedent to all desire, purpose, and intention on the part of the sinner to come to Christ; so that, while it is possible for all to be saved with it, none can be saved without it.

"41. This call is not irresistible, but is effectual in those only who, in penitence and faith, freely surrender themselves wholly to Christ, the only name whereby men can be saved."

Under this same general head fall the sections in the Cumberland Presbyterian Confession of Faith, there distributed under the heading: "Regeneration," which, says Dr. Hodge (Com. on Conf. of Faith, p. 236) "is the effect produced by the Holy Spirit in effectual calling, viz.:

## "REGENERATION.

"51. Those who believe in the Lord Jesus Christ are regenerated, or born from above, renewed in spirit, and made new creatures in Christ.

"52. The necessity for this moral purification arises out of the enmity of the human heart against God, its insubordination to his law, and its consequent incapacity to love and glorify God.

"53. Regeneration is of God's free grace alone, and is the work of the Holy Spirit, who, by taking of the

things which are Christ's, and showing them unto the sinner, enables him to lay hold on Christ. This renewal of the heart by the Holy Spirit is not of the nature of a physical, but of a moral work—a purification of the heart by faith.

"54. All infants dying in infancy, and all persons who have never had the faculty of reason, are regenerated and saved."

In the Catechism of the Cumberland Presbyterian Church the following appears upon the subject:

"Q. 21. What are the evils of that estate into which mankind fell?

"A. Mankind, in consequence of the fall, have no communion with God, discern not spiritual things, prefer sin to holiness, suffer from the fear of death and remorse of conscience, and from the apprehension of future punishment.

"Q. 22. Did God leave mankind to perish in this estate?

"A. No. God, out of his mere good pleasure and love, did provide salvation for all mankind.

"Q. 23. How did God provide salvation for mankind?

"A. By giving His son, who became man, and so was, and continues to be, both God and man in one person, to be a propitiation for the sins of the world."

In the Larger Catechism of the Presbyterian Church in the United States of America the following appears upon the same subject:

Landrith v. Hudgins.

"Q.  67.  What is effectual calling?

"A.  Effectual calling is the work of God's almighty power and grace, whereby (out of His free and especial love to His elect, and from nothing in them moving Him thereunto) He doth, in His accepted time invite and draw them to Jesus Christ, by His word and spirit, savingly enlightening their minds, renewing and powerfully determining their wills so as they (although in themselves dead in sin) are hereby made willing and able, freely to answer His call, and to accept and embrace the grace offered and conveyed therein.

."Q.  68.  Are the elect only effectually called?

"A.  All the elect, and they only are effectually called; although others may be and often are, outwardly called by the ministry of the word, and have some common operation of the Spirit; who, for their willful neglect and contempt of the grace offered to them, being justly left in their unbelief, do never truly come to Jesus Christ."

The following appears in the Shorter Catechism of that Church, on the same subject:

"Q.  19.  What is the misery of that estate whereinto man fell?

"A.  All mankind, by their fall, lost communion with God, are under his wrath and curse, and so made liable to all the miseries of this life, to death itself, and to the pains of hell below.

"Q.  20.  Did God leave all mankind to perish in the estate of sin and misery?

"A. God, having out of his mere good pleasure, from all eternity, elected some to everlasting life, did enter into a covenant of grace to deliver them out of the estate of sin and misery, and to bring them into an estate of salvation by a Redeemer.

"Q. 21. Who is the Redeemer of God's elect?

"A. The only Redeemer of God's elect is the Lord Jesus Christ, who, being the eternal son of God, became man and so was, and continueth to be God and man, in two distinct natures and one person forever."

On the subject of justification, the Cumberland Presbyterian Confession of Faith contains the following:

## "JUSTIFICATION.

"48. All those who truly repent of their sins, and in faith commit themselves to Christ, God freely justifies, not by infusing righteousness into them, but by pardoning their sins, and by counting and accepting their persons as righteous; not for anything wrought in them or done by them, but for Christ's sake alone; not by imputing faith itself, or any other evangelical obedience, to them as their righteousness, but by imputing the obedience and satisfaction of Christ unto them, they receiving and resting on him and his righteousness by faith.

"49. Justification is purely of God's free grace, and is a full pardon for all  sins, and exemption from all their penal consequences; but it imparts no moral qualities or merits to the believer, being strictly a legal transaction. Though of free grace alone, it is conditioned upon faith, and is assured to none but penitent

and true believers, who, being justified, have peace with God through our Lord Jesus Christ."

Upon the subject of sanctification, the Cumberland Presbyterian Confession of Faith has the following:

"37.   When the sinner is born of God, he loves him supremely, and steadfastly purposes to do his will; yet, because of remaining corruption, and of his imperfect knowledge of moral and spiritual things, he often wills what in itself is sinful.   This imperfect knowledge and corruption remain, in greater or less force during the present life; hence the conflict between the flesh and the spirit."

In addition to what has been taken on this subject from the Westminster Confession of Faith, which is used by the Presbyterian Church in the United States of America, we copy the following from the Larger Catechism used by that church, viz.:

"Q.   75.   What is sanctification?

"A.   Sanctification is a work of God's grace, whereby they whom God hath before the foundation of the world chosen to be holy, are in time, through the powerful operation of His spirit, applying the death and resurrection of Christ unto them, renewed in their whole man after the image of God."

Upon the subject of saving faith, the Cumberland Presbyterian Confession of Faith has the following:

"45.   Saving faith, including assent to the truth of God's holy word, is the act of receiving and resting upon Christ alone for salvation, and is accompanied by con-

trition for sin, and a full purpose of heart to turn from it and live unto God."

Upon the subject of the preservation of believers, which is equivalent to the perseverance of the saints in the Westminster Confession of Faith, we have, in the Cumberland Confession, the following:

### "PRESERVATION OF BELIEVERS.

"60. Those whom God hath justified, he will also glorify; consequently, the truly regenerated soul will not totally fall away from a state of grace, but will be preserved to everlasting life.

"61. The preservation of believers depends on the unchangeable love and power of God, the merits, advocacy and intercession of Jesus Christ, the abiding of the Holy Spirit and seed of God within them, and the nature of the Covenant of Grace. Nevertheless, true believers, through the temptations of Satan, the world, and the flesh, and the neglect of the means of grace, may fall into sin, incur God's displeasure, and grieve the Holy Spirit, and thus be deprived of some measure of their graces and comforts, and have their consciences wounded; but the Christian will never rest satisfied therein."

In the first "Concurrent Declaration," the Brief Statement of the Reformed Faith adopted in 1902 by the general assembly of the Presbyterian Church in the United States of America is especially referred to, but as it is explained in the record that this Brief State-ment of the Reformed Faith is not a part of the Confes-

Landrith v. Hudgins.

sion of Faith, and may be changed by any general assembly, it need not be further noticed. We now reproduce at this point the First Concurrent Declaration which accompanied the "Plan of Reunion and Union" of the two churches, and which was often referred to in the proceedings for union.

The concurrent declarations are preceded by the following introductory matter:

"As there are matters pertaining to the interests of the church, which will manifestly require adjustment when the reunion shall have been accomplished, and concerning which it is highly desirable there shall be a previous good understanding, the two assemblies agree to adopt the following concurrent declarations as in their judgment proper and equitable arrangements and agreements."

Then follows the First Concurrent Declaration, to wit:

"1. In adopting the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, as the Basis of Union, it is mutually recognized that such agreement now exists between the system of doctrine contained in the Confessions of Faith of the two churches as to warrant this union—a union alike honoring to both. Mutual acknowledgment also is made of the teaching and defense of the evangelical doctrine held in common by these churches, and of the Divine favor and blessing that have made this common faith and service effectual.

"It is also recognized that liberty of belief exists by virtue of the provisions of the Declaratory Statement, which is part of the Confession of Faith of the Presbyterian Church in the United States of America, and which states that 'the ordination vow of ministers, ruling elders and deacons, as set forth in the Form of Government, requires, the reception and adoption of the Confession of Faith, only as containing the system of doctrine taught in the Holy Scriptures.' This liberty is specifically secured by the Declaratory Statement, as to chapter 3 and chapter 10, section 3, of the Confession of Faith. It is recognized also that the doctrinal deliverance contained in the Brief Statement of the Reformed Faith adopted in 1902 by the General Assembly of the Presbyterian Church in the United States of America, 'for a better understanding of our doctrinal beliefs,' reveals a doctrinal agreement favorable to reunion."

This Concurrent Declaration, having been adopted by the general assembly of each of the two organizations, shows the points upon which the minds of the two assemblies met in respect of the doctrinal effect of the affirmative vote of the presbyteries of each body in response to the question propounded to them under the second subdivision of the Plan and Basis of Union, to the purport that the union should be effected "on the doctrinal basis of the Confession of Faith of the Presbyterian Church in the United States of America, as revised in 1903, and of its other doctrinal and eccle-

Landrith v. Hudgins.

siastical standards," and that the Scriptures of the Old and New Testaments were acknowledged as the inspired word of God, the only infallible rule of faith and practice. The points of agreement as stated in the Concurrent Declaration were first "that such agreement now exists between the system of doctrine contained in the Confessions of Faith as to warrant this union"; secondly, "that liberty of belief exists by virtue of the provisions of the Declaratory Statement, which . . . requires the reception and adoption of the Confession of Faith, only as containing the system of doctrine taught in the Holy Scriptures"; that "this liberty is specifically secured by the Declaratory Statement, as to chapter 3 and chapter 10, section 3, of the Confession of Faith."

The nature of this "liberty of belief" is more specifically indicated in the Moffat Resolution which was at the same meeting adopted by both assemblies, viz.: "That ministers, ruling elders, and deacons, in expressing approval of the Westminster Confession of Faith, as revised in 1903, are required to assent only to the system of doctrine contained therein, and not to every particular statement in it; and inasmuch as the two assemblies meeting in 1904 did declare that there was then a sufficient agreement between the systems of doctrine contained in the confessions of the two churchs to warrant the union of the churches, therefore the change of doctrinal standards resulting from the union involves no change of belief on the part of

121 Tenn—40

any who are ministers, ruling elders or deacons in the Cumberland Presbyterian Church. Further, this assembly specifically declares that, since the revision of 1903, by which the Confession of Faith was amended by change of its text, and by a Declaratory Statement, and by additions, it is no longer allowable to interpret our system of doctrines in any fatalistic sense; nor are we willing to admit that such fatalistic interpretation was ever warranted, whatever misapprehension may have existed in the mind of any person."

It is perceived that the assemblies do not declare that the two Confessions of Faith, since the revision of one of them, are equivalent in doctrine on the disputed points, or are in substantial accord, but only "such an agreement" exists between them as to warrant a union, or, as it is otherwise phrased by them, "a sufficient agreement" to warrant the union. This carefully prepared form of statement, and the absence of a statement of full and substantial accord, indicates a consciousness of an existing substantial difference which was to be bridged by the "liberty of belief." This same consciousness is indicated by the introduction to the Concurrent Declarations, and also by the fact that there was any concurrent declaration at all upon the subject. If the union was to become effective on the basis of the Confession of Faith and other standards of the Presbyterian Church in the United States of America, no more was needed to be said. These standards spoke for themselves.

We should here note with more particularity the significance of the expression "such agreement . . . as to warrant this union," and "a sufficient agreement . . . to warrant the union," appearing in the Moffat resolution.

If there had been an explicit declaration on the part of the two assemblies, that the two systems of doctrine were in full accord, or in substance the same, and if it had been a matter about which a fair difference of opinion might exist, we should feel bound to give such declaration very great weight on the ground that the persons composing such assemblies are far more familiar with theological questions than the members of a civil court can be. But, when the general assembly declares, not that such and such is the true doctrine of the church, but that there is simply "a sufficient agreement" between its system and that of another organization to warrant a union between the two, it is not engaged in making a statement of doctrine, but merely that a certain negotiation is feasible. It is only expressing its opinion as to the propriety of a union. And this involves two considerations: Firstly, whether, from an ecclesiastical standpoint, the union should be made, which was a matter for the presbyteries; secondly, whether it would carry the property of the church with it, a matter for the decision of the civil court. So, from every standpoint, the first Declaratory Statement was wholly ineffective.

We are then compelled to determine for ourselves, whether the two systems of doctrine are substantially the same. We must determine this question in the affirmative, before we can be justified in holding that the property formerly belonging to the Cumberland Presbyterian Church now belongs to the Presbyterian Church in the United States of America. This is true because the deed to the property in question in the present case was made to trustees for the benefit of a Cumberland Presbyterian congregation, and cannot, without breach of the contract, be diverted to the maintenance of a different faith, unless the Cumberland Presbyterian faith has been changed into the new form, by competent ecclesiastical authority—a matter which we shall consider further on.

We think it is quite apparent from the record of the proceedings for union that the Presbyterian Church in the United States of America adheres to every line of the Westminster Confession, and regards the Declaratory Statement not as an amendment or change of the Confession, but only an explanation of it, for the purpose of disavowing inferences drawn from certain statements in the Confession of Faith, and to give legal standing to interpretations of chapter 3 and of chapter 10, section 3, which previously had seemed to have merely the force of private opinion, and also to set forth clearly some aspects of revealed truth which appeared to call for more explicit statement. The general assembly of that church explicitly declared, by resolution, that

Landrith v. Hudgins.

these things had been made clear to the committee of the Cumberland Presbyterian Church, and also "that the revision of the Confession of Faith had effected no material change in the doctrinal attitude" of that church. Again, in another resolution during the same sitting, it declared "that the revision of the Confession of Faith in 1903 has not impaired the integrity of the system of doctrine contained in the Confession and taught in Holy Scripture, but was designed to remove misapprehension as to the proper interpretation thereof." Again, in 1907, that church, in answer to a letter from the assembly at Dickson, Tenn., denied that it had abandoned the Westminster Confession of Faith. It is apparent from the minutes of the Cumberland Presbyterian Assembly that it looked upon the revision as an amendment, and relied strongly upon the first Concurrent Declaration, and upon the "Brief Statement of the Reformed Faith," which is not a part of the Presbyterian Confession at all, as clearly understood upon both sides.

We are of opinion that the effect of the Declaratory Statement is correctly set forth in an article written by Rev. Benjamin B. Warfield, D. D., LL. D., of Princeton Theological Seminary, a distinguished minister and theologian of the Presbyterian Church in the United States of America. This article was printed in the Union Seminary Magazine, Richmond, Va., vol. 16, No. 1, and was entitled, "The Confession of Faith as Revised in 1903."

He says in this article:

"The Declaratory Statement is not a 'revision' of the text of the Confession, nor an 'addition' to the text of the Confession. It is only an 'explanation' of the text of the Confession. The text itself it leaves intact; and it not only leaves the text intact, it reaffirms that text. What it sets itself to do, in fact, is to protect this text from false inferences and to strengthen it by explication. That this is the real state of the case will be apparent if we give attention to the terms of the preamble by which the Declaratory Statement is introduced. This preamble is as follows:

" 'While the ordination vow of ministers, ruling elders and deacons, as set forth in the Form of Government, requires the reception and adoption of the Confession of Faith only as containing the system of doctrine taught in the Holy Scriptures, nevertheless, seeing that the desire has been formally expressed for a disavowal by the Church of certain inferences drawn from statements in the Confession of Faith, and also for a declaration of certain aspects of revealed truth which appear at the present time to call for more explicit statement, therefore the Presbyterian Church in the United States of America does authoritatively declare as follows.'

"It will be observed that the preamble confines the Declaratory Statement to two things: (1) 'A disavowal of certain inferences drawn from statements in the Confession of Faith,' and (2) 'a declaration of certain as-

pects of revealed truth which appear at the present time to call for more explicit statement.' All the Declaratory Statement does is ranged under these two categories. Now, the disavowal specifically of 'certain inferences drawn from statements in the Confession' imports the retention of these statements. It is not the 'statements' that are disavowed, but 'certain inferences drawn from them.' The disavowal of inferences is a protective measure designed to defend the statements themselves; and to defend statements is the precise contrary of disavowal of them. The 'statements' in the Confession of Faith, with which this Declaratory Statement deals, are, therefore, so far from being repudiated, that they are reaffirmed by it. Again, to speak of making a 'more explicit statement' of 'certain aspects of revealed truth' is to say that what already stands stated is 'truth,' and specifically 'revealed truth'; and to imply that even the aspects of this revealed truth which it is now proposed to emphasize are already present in the existing statements, implicitly at least, if only somewhat less explicitly than it now seems desirable to state them. The fuller explication of certain aspects of statements is the very opposite of disavowal of these statements; it is, again, their reaffirmation.

"It is perfectly clear, therefore, that the Declaratory Statement is as far as possible from antagonizing the passages of the Confession with which it deals. It does not even propose to state truths not already discoverable, in one way or another, in those passages, much

less to state truths in any way contradictory to, or inconsistent with, anything found in those passages. What it proposes is summed up absolutely in these two things: To protect more carefully the confessional statements against 'certain inferences' sometimes drawn from them to their disadvantage, and to develop more fully in certain directions the truths contained in the confessional statement. The passages with which the Declaratory Statement deals, now, are specifically the third chapter, 'Of God's Eternal Decree,' and the third section of the tenth chapter, which sets forth the method of the salvation of infants, dying such. The Declaratory Statement, therefore, reaffirms the confessional doctrines of the decree of God, and of the method of the salvation of infants, dying such; and undertakes to guard these doctrines from false inferences, affirmed to be sometimes drawn from them, and to explicate them in some of their aspects supposed to be less fully stated in the Confession than seems now desirable. Let us see how it does these things.

"The Declaration as to the decree of God: The first section of the Declaratory Statement has reference to the third chapter of the Confession, and to the doctrine of God's Eternal Decree therein taught. Its end, according to the preamble, is to guard this doctrine from certain false inferences, sometimes drawn from it as stated in the Confession, and to explicate it more fully than is done in the Confession in certain of its aspects. It runs as follows:

" 'The Presbyterian Church in the United States of America does authoritatively declare as follows:

" 'First.  With reference to chapter 3 of the Confession of Faith, that concerning those who are saved in Christ, the doctrine of God's Eternal Decree is held in harmony with the doctrine of his love to all mankind; his gift of his Son to be the propitiation for the sins of the whole world, and his readiness to bestow his saving grace on all who seek it.  That concerning those who perish, the doctrine of God's Eternal Decree is held in harmony with the doctrine that God desires not the death of any sinner, but has provided in Christ, a salvation sufficient for all, adapted to all, and freely offered in the Gospel to all; that men are fully responsible for their treatment of God's gracious offer; that his Decree hinders no man from accepting that offer; and that no man is condemned except on the ground of his sins.'

"We observe that this Declaration begins by very strongly emphasizing the reaffirmation of the doctrine of the Decree, which is already implied in the preamble, 'With reference to chapter 3 of the Confession of Faith,' it declares that 'the doctrine of God's Eternal Decree' therein taught—both 'concerning those who are saved in Christ,' and 'concerning those who perish'—'is held.' This doctrine it declares, we observe, 'is held.'  It is not repudiated; it is not modified; it is not qualified; it is not in any way weakened or diluted; it simply 'is held.' Reaffirmation could not be more explicit.

"The purpose of the Declaration is not exhausted, however, by this reaffirmation. Not only is the doctrine of the Decree as defined in the third chapter of the Confession 'held,' but certain other doctrines, which are now enumerated, are held, too; and the purpose of this Declaration is to assert the harmony of this one doctrine that is 'held' with these other doctrines that are held along with it. The assertion is not, be it observed, that these doctrines, here enumerated, are held in despite of the doctrine of the Decree as set forth in the third chapter of the Confession, as some seem strangely to suppose. It is not even that the doctrine of the Decree as set forth in the third chapter of the Confession is held in despite of these other doctrines here enumerated, which are nevertheless recognized as also true. Much less is it that the doctrine of the Decree as set forth in the third chapter of the Confession is held so far only as it is . . . in harmony with these other doctrines now enumerated. . . . The assertion is not of the doctrine of the Decree as set forth in the third chapter is out of harmony with the doctrines here enumerated, and therefore cannot be held, at least in its integrity, along with them, but must be modified to make room for them, if not wholly set aside that they may be held in its stead. On the contrary, the explicit assertion is that the doctrine of the Decree, as set forth in the third chapter of the Confession of Faith, both can be, and actually is 'held' by the signatories of the

Landrith v. Hudgins.

Confession, in harmony with these other doctrines, and therefore needs no modification in order to make room for them. In one word, what we have here is the most emphatic assertion possible of the harmony of the doctrine of the Decree as set forth in the third chapter of the Confession of Faith with the doctrines here enumerated. The edge of the implied polemic is directed not against the third chapter of the Confession, or the doctrine there stated, but against all and every one who suppose that the doctrine of God's Eternal Decree there stated is not, and cannot be, held in harmony with the doctrines here enumerated; or needs any modification whatever in order that the doctrines here enumerated may be held, or may come to their rights.

"Now, what are the doctrines of which it is here declared that they are in harmony with the doctrine of the Decree as set forth in the third chapter of the Confession, and may usefully be published now to refute false inferences drawn from that doctrine, or to bring out more clearly some of its implications? They are enumerated in two sets. The one set is to protect from false inferences, and to bring out the implications of the doctrine of the Decree in its relation to the saved; the other in its relation to the lost. In the first instance the following propositions are enumerated: (1) That God loves all mankind; (2) that he has given his Son to be a propitiation for the sins of the whole world; (3) that he is ready to bestow his saving grace on all who seek it. In the second instance, it is declared (4)

that God desires not the death of any sinner; (5) that he has provided in Christ a salvation sufficient for all, adapted to all, and freely offered in the Gospel to all; (6) that men are fully responsible for their treatment of God's gracious offer; (7) that his Decree hinders no man from accepting that offer; (8) that no man is condemned except on the ground of his sin.

"Here are eight doctrinal propositions, all of which are declared to be in harmony with the doctrine of the Decree as set forth in the third chapter of the Confession, and to be held by the signatories of the Confession in conjunction with that doctrine; enumerated here either to repudiate false inferences drawn from that doctrine as set forth in the Confession or to explicate more fully aspects of truth less fully brought to expression in the confessional statement than may be now thought desirable. Obviously there is a polemic edge to the enumeration. Against whom is it turned? Of course, against those who deny that the doctrines here enumerated are harmonious with the doctrines of the Decree as set forth in the third chapter of the Confession. And that is to say, against Arminian objectors to the doctrine of the Decree as set forth in the third chapter of the Confession, the very essence of whose objections to that doctrine has ever been that it is inconsistent with the doctrinal propositions here enumerated, and is not, and cannot be held, in harmony with them. The first section of the Declaratory Statement appears, then, to be nothing other than a sharp repudia-

tion of the ordinary Arminian assault on the doctrine of the Decree, as set forth in the third chapter of the Confession, and puts in a brief, assertory form the common Calvinistic response to this assault."

So far as the doctrines embraced in the new chapters 34 and 35 bear upon those enunciated in the Declaratory Statement they do not materially differ, and call for nothing additional to what has been said upon that subject.

It results therefore that those who went into the union with the Presbyterian Church in the United States of America adopted all of the old statements of the Westminster Confession of Faith as well as the new.

Can the simple statements which we have copied from the Cumberland Presbyterian Confession of Faith be held a full equivalent of the vast and imposing theological structure contained in the Westminster Confession of Faith? The most that can be said in the way of harmonizing the two systems is that the Presbyterians seem to claim that their system presents two aspects of a single truth, of which the Cumberland Presbyterian system presents only one. It seems to be agreed, as we understand the excerpts made from the minutes of the two organizations, that the Cumberland Presbyterian statement of the theological truth, in the particular aspect of that truth, presented in the standards of that church, is correct as far as it goes. Hence it is said, in the Moffat Resolution, that no minister, elder, or deacon, formerly belonging to the Cumberland Presby-

terian Church need change his belief. There still remains, however, that other aspect of the truth, which is set forth in the Westminster Confession of Faith, as it stood prior to the revision. The union is made upon the Westminster Confession as revised; that is, as containing an expression of both aspects of the truth.

Right here, however, it is said there is a "liberty of belief" vouchsafed in the First Concurrent Declaration and in the Moffat Resolution.

In another resolution, however, it is said that there is to be permitted to the ministers, elders, and deacons, received through union with the Cumberland Presbyterian Church no greater "liberty of belief" than is permitted to the ministers, elders, and deacons, of the Presbyterian Church in the United States of America. What that "liberty of belief" is it is impossible to learn from this record, except from the Declaratory Statement, and the First Concurrent Declaration, wherein it is stated that "the ordination vow of ministers, ruling elders, and deacons, as set forth in the Form of Government, requires the reception and adoption of the Confession of Faith, only as containing the system of doctrine taught in the Holy Scriptures"; and from the Moffat Resolution wherein it is said "that ministers, ruling elders and deacons, in expressing approval of the Westminster Confession of Faith, are required to assent only to the system of doctrine contained therein, and not to every particular statement in it." How far this goes it is impossible to say. May the officers referred to select out of

Landrith v. Hudgins.

the body of doctrines embraced in the Confession as re-
vised such statements of doctrine, or such doctrines as
they can give assent to and reject all the rest?
If so, there can be no uniformity of teaching.
In one church or congregation one doctrine will be
taught, and in another congregation a different doctrine.
This is chaos; yet is it not the logical result of the Moffat
Resolution that the officers referred to are required to
"assent only to the system of doctrine, . . . and not
to every particular statement in it"? Are not the state-
ments of doctrine composing a system of doctrine but
parts of the system? Is not the system composed of
these parts—these statements of doctrine? If the min-
isters who are to teach the people are permitted to pick
and choose among these statements of doctrine such
as they are willing to teach, and reject the rest, and yet
remain in good standing, what guaranty can there be
of religious peace in the congregations? Should the de-
fendants who object to being placed in this situation be
compelled to adopt it or submit to it on pain of losing
their church property if they refuse? Take either view
of the situation. If it be the true construction of the
proceedings for union had between the two churches,
that Cumberland Presbyterians entering into the union
must adopt the whole Confession of Faith of the Presby-
terian Church in the United States of America, as re-
vised in 1903, which we have found necessarily implies
(leaving out of view the liberty of belief above referred
to) an adherence to all statements of Calvinistic doc-

trine contained in the Confession along with the matter added by way of revisal; should the defendants be compelled, under the penalty above referred to, to surrender the plain and simple statements of their Confession, and receive in substitution therefor the Westminster Confession which contains far more than they had subscribed to in their own Confession? Or take the view that under the Moffat Resolution they can believe as much as they list of the Westminster Confession revised, and reject the residue, ought they to be compelled, on pain of losing their property, to surrender the clear, definite, and precise statements of their own Confession, and receive in exchange therefor a system so slack that any one may impeach any of its doctrines without danger of incurring a charge of heresy? Certain it is that a house of worship, devoted by the deed conveying it to trustees for the use of a congregation of Cumberland Presbyterians would not be serving that purpose if devoted to uses falling under either aspect of the question above considered.

Attention is called to the fact that communicants are not required to subscribe to the Confession of Faith, but only to make an open confession of their faith in Jesus Christ. This is true, but it does not materially change the problem. This means simply that the church does not make belief in the Confession of Faith a condition of salvation. However, after persons become members of the church, then it is the duty of the ministers to teach and train them. The same service is additionally

performed for the children in the sabbath school. The minister in teaching and training the people must, from time to time, expound to them the doctrines of the church. The people take an interest in these matters, and it would very soon transpire that a minister not orthodox, not only would fail to be called to any charge after the discovery of his unsoundness, but would be proceeded against in the presbytery and expelled. The fact that the doctrines of the Westminster Confession are taught the children is fully shown by the questions and answers which we have taken from the Larger Catechism and the Shorter Catechism and copied into a former part of this opinion.

The next question to be considered is whether the vote of the presbyteries in 1905, on the question, embraced within the plan of union, can be held operative as an amendment of the Confession of Faith, under the constitution of the Cumberland Presbyterian Church.

The matter of amendment is governed by section 60 of the constitution of that church. This section reads as follows:

"Upon the recommendation of the General Assembly, at a stated meeting, by a two-thirds vote of the members thereof voting thereon, the Confession of Faith, Catechism, Constitution, and Rules of Discipline may be amended or changed when a majority of the presbyteries, upon the same being transmitted for their action, shall approve thereof. The other part of the government— that is to say, the General Regulations, the Directory

121 Tenn—41

for Worship, and the Rules of Order—may be amended
or changed at any meeting of the General Assembly by
a vote of two-thirds of the entire number of commission-
ers enrolled at that meeting, provided such amendment
or change shall not conflict in letter or spirit, with the
Confession of Faith, Catechism, or Constitution."

An instructive example of what is meant by this sec-
tion is shown by the course pursued when the amended
Confession of Faith was adopted in 1883.  It appears
from a statement of the matter contained in the preface
thereto, that the general assembly, in committee of the
whole, considered with great patience and care every
item in the entire book, taking a vote on each one sep-
arately, and at the close of each chapter, taking a vote
upon it as a whole, and in this way the entire book was
gone through with.  Such we think was the true course.
It is said in the section that the general assembly shall
recommend amendments to the presbyteries for their
vote thereon, or which comes to the same thing, that
upon the recommendation of the general assembly, by
a two-thirds vote, the Confession of Faith may be
amended or changed when a majority of the presby-
teries, upon the same being transmitted for their ac-
tion, shall approve thereof.

Now, in the present case, what was done by the gen-
eral assembly of 1904 was that the basis of union was
recommended to the presbyteries for their approval or
disapproval.  This basis of union did not contemplate
any action upon the Confession of Faith of the Cum-

berland Presbyterian Church at all; but, ignoring that paper, submitted to the presbyteries the question whether they would sanction a union on the basis of the Confession of Faith of the Presbyterian Church in the United States of America. The question was not whether the Cumberland Presbyterian Church would amend its own Confession of Faith, or change it, into a form deemed more suitable for its guidance in its continued and subsequent life, but whether the Cumberland Presbyterian Church should unite with another organization on the basis of the Confession of Faith of that organization.

In order to comply with the provisions of section 60, if it was desired to amend the Confession of Faith of the Cumberland Presbyterian Church so as to make it conform to the Confession of Faith of the Presbyterian Church in the United States of America, the provisions of the latter Confession of Faith should have been imported into the Cumberland Presbyterian Confession of Faith, by a two-thirds vote of the general assembly and a subsequent ratification by a majority of the presbyteries. If by such vote the Confession of Faith of the Cumberland Presbyterian Church had been amended and changed, all of the officers and members of that church would have been bound thereby. But it is said that this was an unnecessary preliminary, that the vote taken should be treated as equivalent to an amendment. This is a mistaken view. As previously pointed out the constitution and standards of the church constitute a con-

tract, in legal contemplation, between all the members of that church, and it was the just expectation of the parties that its terms should be complied with in the usual way; and that just expectation could be met only by such compliance. It would not be right to say that some other proceeding was equivalent. The soundness of this view is further enforced by the nature of the questions raised in prosecution of the enterprise. These questions were, not as to the adoption by Cumberland Presbyterians of the terms of the Confession of Faith of the Presbyterian Church in the United States of America, or the incorporation of those terms into the Cumberland Presbyterian Confession, but whether there was a sufficient agreement between the doctrines taught in the two Confessions to justify union between the two bodies, and to what extent liberty of belief might be indulged and enjoyed in matter of doctrine, on points of apparent divergence between the two Confessions. Certainly, such proceedings are not designed to consider matters of amendment. The process of making amendments is far different from the one above outlined. The proceedings undertaken inaugurated simply a matter of negotiation. The Cumberland Presbyterian Church said, in effect, to the Presbyterian Church in the United States of America, we will go with you if we can agree upon terms. We do not fully agree on matters of doctrine, but we think there is a sufficient agreement to warrant a union between us, and whatever differences of doctrine there may be will be abridged by a covenant

beforehand that we may have liberty of belief on such matters.

In what has been said, both in respect of the effect of the failure to submit the whole basis of union to the presbyteries of the Cumberland Presbyterian Church, and also in what has been said in respect of the want of harmony between the two Confessions of Faith, and the want of conformity to section 60 in the matter of amendment, we have assumed that the civil court, administering the law of the land, in disposing of property rights, had the power to determine for itself, as a necessary preliminary, the theological questions involved, as being in the nature of the facts on which the controversy must turn. It has been insisted, in substance, by counsel for complainants, that in respect of ecclesiastical questions this court is bound by the decision of the ecclesiastical courts. The question has been discussed in the briefs as to whether the ecclesiastical courts in making the determinations referred to, were acting in a judicial or legislative capacity; these bodies, under the ecclesiastical system which we are examining, possessing both of these powers, and also executive powers. We think it immaterial whether the power exercised was legislative or judicial, though of course it was the former, as no case or controversy between parties was on trial. The question simply is whether the determination of an ecclesiastical question by an ecclesiastical body is binding upon a civil court administering the law of the land, in disposing of property rights, when the correct

view of the nature, means, extent, and bearing of such ecclesiastical question is necessary to be determined in order to settle property rights. Another aspect of the same question is whether the civil court has power to determine whether a particular ecclesiastical body, within the general organization had jurisdiction, under the constitution or constituent contract of the ecclesiastical organization to pass upon the particular question.

If neither the question to be decided in a given case (the ecclesiastical question), nor the power (jurisdiction) of the ecclesiastical court that decided it, is open to examination in the civil court, then there is nothing in any case for the civil court to do except to register the decrees of the ecclesiastical court, and hand over the property, to one or the other of the contestants, in accordance therewith. This makes the civil court but the clerk and sheriff of the ecclesiastical court. Such construction puts the civil court in the attitude of declining to consider the terms of the contract on which the rights of the contending parties are based, and to which both appeal. The civil courts have no power, under the constitutions by which they exist, in this country, to intermeddle with religious matters purely as such, or to assume to settle for contending parties in churches any question of doctrine, discipline or organization. These are things wholly apart and aside from the paths to which civil courts are accustomed, and the fields in which they are wont to work. But when church organizations buy and take title to property, then they enter

the domain wherein civil courts control.   In case any question arises between contending parties or individuals, as to such property, the title, right of possession, or use, that question must be decided by the civil court. It must be decided like any other question, according to the contract on which the right is based.   In order to ascertain the terms of that contract, and its true construction, it may become necessary to decide ecclesiastical or theological questions.   If such question has not previously been decided by any tribunal within the church organization, the civil court will decide it according to the best lights attainable.   If it has been already decided by any tribunal of the church appropriate for its decision under the contract, before the controversy arose on which the subsequent litigation was based, the civil court will give that decision very great, if not controlling, weight.   To give weight to a rule laid down, or an interpretation rendered, by one of the parties to the controversy, after the controversy had arisen, would be abhorrent to every sense of right; it would be tantamount to making one party a judge in his own case against the other.   The civil court, in deciding a property right, should honor the deliverances of the ecclesiastical court with the greatest attention and respect, but should not follow it unquestioningly in every case.   If the civil court can see clearly and satisfactorily that the ecclesiastical court was in error, then it should say so and adjudge accordingly.   It can do no less in view of its obligation to do justice between the parties.   It cannot, in

discharging its duty to decide on questions of property, hand over its conscience to the keeping of any church organization. The civil court cannot rightly evade the labor of investigating the questions that arise in such controversies, no matter how difficult or unfamiliar the questions may be, nor can it escape the responsibility no matter how embarrassing. It is proper that the civil court should act with diffidence, it is true, on such questions, yielding all respect due to the opinions of experts, as upon any subject on which expert evidence is required, but when it clearly appears that the ecclesiastical tribunal is wrong it should not be followed. If the civil court look wholly to the ecclesiastical courts for the settlement of the principle, or as the case may be, the facts, on which the right of property turns, then the former court abdicates its functions in favor of the latter. The civil court cannot invade the sacred inclosure of the church, and assume to direct her teachings, or the administration of her rites and ceremonies, or to hinder the imposition of her censures, but where property rights are involved, the church, as to these, stands on the same plane with all other persons, natural and corporate, no higher, no lower. The law is over all.

It is to be observed that we are not assuming to exercise any control over the Cumberland Presbyterian Church, or the Presbyterian Church in the United States of America, as such, or over the members of either one of these churches. Nor do we assume to control the action of any one who has gone into the union of the

two churches, either to preserve or hinder the ecclesiastical results of that action one way or the other. We simply deal with the question of property. The complainants come before the court asserting that the union is valid; that they have become a part of it, and, by reason of this fact, are entitled to the possession and use of the church property involved, and that the defendants who repudiate the union have thereby withdrawn from the organization and lost all rights in the property. Necessarily the complainants, occupying this attitude, invite the court to determine whether the union was valid, and in reaching a conclusion upon this point we have been compelled to examine the powers conferred by the constituent contract or constitution, upon the ecclesiastical bodies performing the act. We have not assumed to interfere with ecclesiastical bodies in their course of action, nor to impose any restriction whatever upon that religious freedom which is guaranteed by the constitution. We have no right to question any man's religious views; we have no right to praise or blame any man for espousing one religious doctrine or renouncing another; nor have we any right to express an opinion as to whether any religious doctrine is soundly based upon the scriptures. We have not sought to interfere with the internal administration of either of the religious bodies. As to all of these matters, the churches are wholly free from the interference of the civil courts. We deal only with the property rights of the churches, but in doing this, we must ascertain, as in other cases,

the provisions of the contract on which they are based, and out of which they grow.

It is to be noted, also, that we are not dealing with any right growing out of disciplinary proceedings of either of the churches. In this latter class of cases the rule is that the civil court will not intermeddle at all, except in the very limited way pointed out in the cases of *Bonacum* v. *Murphy*, 71 Neb., 463, 98 N. W., 1030, 104 N. W., 180, and *Hatfield* v. *De Long*, 156 Ind., 207, 59 N. E., 483, 51 L. R. A., 751, 83 Am. St. Rep., 194, wherein the civil court interfered to prevent the trial of persons arraigned before a tribunal of the church not constituted according to the plain and undoubted rules of the organization. In disciplinary cases of which *Harmon* v. *Dreher*, Speers, Eq. (S. C.) 87, is an example, the civil courts will accept the ecclesiastical decision as binding, and will enforce the legal right arising out of it. That case turned upon certain rights in the use of church property claimed by the minister notwithstanding his expulsion from the synod as one of its members. Speaking to this subject the court said: "He stands convicted of the offenses alleged against him, by the sentence of the spiritual body of which he was a voluntary member, and by whose proceedings he had bound himself to abide. It belongs not to the civil power to enter into or review the proceedings of a spiritual court. The structure of our government has for the preservation of civil liberty rescued the temporal institutions from

religious interferences.   On the other hand, it has se-
cured religious liberty from the invasion of civil au-
thority.    The judgments, therefore, of religious associa-
tions bearing on their own members are not examinable
here, and I am not to inquire whether the doctrines
attributed to Mr. Dreher were held by him, or whether,
if held, were anti-Lutheran, or whether his conduct was
or was not in accordance with the duty he owed to the
synod or to his denomination. . . . When a civil
right depends upon an ecclesiastical matter it is the
civil court and not the ecclesiastical which is to decide.
But the civil tribunal tries the civil right and no more,
taking the ecclesiastical decisions out of which the civil
right arises, as it finds them.". Another illustration of
this class of cases is found in *Wheelock* v. *First Presby-
terian Church,* 119 Cal., 477, 51 Pac., 841.   In that case
an incorporated Presbyterian Church had been divided
by the authority of the presbytery to which it was
subordinate into two organizations, and the presbytery
directed a division of the funds realized from the sale
of real estate of the corporation to be made between
the two churches in proportion to their membership.  An
action in equity was brought in behalf of one of the
organizations against the other for a division of the
church property.   The court said that it might be con-
ceded for the purpose of the case that the division and
apportionment of the property was a matter for the
civil court, and that an ecclesiastical decree upon that
subject was not binding upon legal tribunals, but held

that-the decree of the presbytery dissolving the original church into two new and independent organizations was conclusive on all the parties, and must be so treated by the civil court in determining the property rights of the parties.   The court then, by the application of equitable principles to the *status* of the parties as fixed by the ecclesiastical decision, came to the same conclusion as the ecclesiastical tribunal with reference to the division of the property.   Another rule falling under this head is that the civil court will not review the action of ecclesiastical courts in the excommunication of members. *Nance* v. *Busby,* 91 Tenn., 303, 18 S. W., 874, 15 L. R. A., 801; *Shannon* v. *Frost,* 3 B. Mon. (Ky.), 253; *People* v. *German,* 3 Lans. (N. Y.), 442; *State* v. *Hebrew Cong.,* 31 La. Ann., 205, 33 Am. Rep., 217.   But in such cases where a property right depends upon the decision, inquiry may be made as to whether or not the resolution of expulsion was the act of the church, or of persons who were not the church, and consequently could not excommunicate others.   *Bouldin* v. *Alexander,* 15 Wall., 139, 21 L. Ed., 69.

In a case where it appears that a church is divided into two parties, the civil court must necessarily examine into the doctrines, laws, and usages of the church in order to determine which party is the true organization.   This class of controversies is illustrated by our own case of *Deaderick* v. *Lampson,* 11 Heisk., 523.   In that case it appeared that a division had arisen in the Presbyterian Church at Jonesboro, arising from

differences growing out of the civil war. A minority of the church seized it, and undertook to carry it over to the New School Presbyterian Church North, thus rescinding the unanimous action of the body by which many years before it had connected itself with the United Synod of the Presbyterian Church, which was the southern branch of the church. After examining the constitution and laws of the church, the court held that the entire action of the parties in possession, from the time of the exclusion of the majority, was unauthorized and void, and that the usurping minority in possession was not the Jonesboro church, and that it could not make itself such by any action of its own, by resolution or organization. It was further held that the court would be bound to treat all the acts of the minority as ineffectual in fixing rights, or for any purpose, and that the complainants, the majority, were entitled to be restored to their original *status,* and to enjoyment of the rights which they possessed and enjoyed at the time the series of illegal acts commenced. The court, in assigning grounds for its action, said:

"In taking cognizance of such a question as is presented in this case, the civil courts do not undertake to revise or correct the action of the ecclesiastical tribunals, established in the various denominations of Christians in our country, so far as the action of such tribunals, within their sphere of operation, is upon the individuals composing their bodies, and affects their individual relation to the body. They have, by voluntarily con-

necting themselves with it, bound themselves to abide by the decisions of its tribunals, in accordance with its established laws and usages.    How far a civil court might interfere to inquire into the regularity of the action of ecclesiastical tribunals, when it is claimed that such action has not been in accordance with their own laws, in matters of discipline, we need not here inquire, as the question is not presented in this form before us. The rule is thus laid down, and we think correctly, by Judge Robertson, of the Supreme Court of Kentucky, in the case of *Gartin* v. *Penick*, 9 Am. Law Reg. (N. S.), 213, that 'while the general desire of courts of law is to avoid ecclesiastical or spiritual questions, they find it impossible to do so.   If a body of men have wrongful possession of a church, or of a sum of money, on the pretense, for example, that they are the religious body to which the money or the building was destined, their opponents have no way of redressing the wrong and vindicating their own right, except by appealing to the civil tribunals of the country, and civil tribunals have no means of doing justice in such cases, except by investigating into differences of doctrine, discipline, or practice, which, to the litigants, may be religious differences, but to the judge are mere matters of fact bearing on a question of civil right.' "

In the same case referred to and approved in the foregoing excerpt it is said:

"From the pleadings and proofs, the judicial deduction is inevitable that the appellants and the appellees,

as now organized, constitute separate and antagonistic churches, each claiming to be the church to which the property in litigation was dedicated; and, consequently, the question now to be decided is one of identity, involving in its solution the equitable title to property dependent on contract, which this court must, when, as in this case, appealed to, interpret and uphold as well between ecclesiastical as civil bodies, or any other parties. The contract is purely civil, and not ecclesiastical, and the usufructuary rights resulting from it depend on the laws of the land, and not on the arbitrium of the general assembly of the church, which has no civil power; but, within the limits of the political and ecclesiastical constitution, has supreme and final jurisdiction over church doctrines and discipline. The jurisdiction of the civil tribunals over church property does not, therefore, conflict with the exclusive jurisdiction of the general assembly in the plentitude of its ecclesiastical power, either legislative or judicial. Without interfering with religious liberty, this court could not control or mould the faith or doctrines of the church; nor could it, consistently, with the spirit of our institutions, authoritatively settle questions of orthodoxy or optimity among professing Christians. But, so far as the identity of the respective claimants with the beneficiary to whom the church property was dedicated may be affected by their doctrines or by the acts of the general assembly, the essential coincidence of the doctrines and the legal effect of those acts must necessarily be considered for the

purpose of deciding the question of title to the property without concluding the general assembly, in any way, in its own proper jurisdiction in its ecclesiastical domain. This is no interference with vital Christianity, but leaves it free and undisturbed by the civil power, and may check its intermeddling, as an organic power, with civil and political rights, as individual citizens, whether in or out of the church, might rightfully do." 5 Bush, 123 and 124. In *Krecker* v. *Shirey*, 163 Pa., 534, 30 Atl., 440, 29 L. R. A., 476, 479, it is said: "It must be borne in mind that the organization of a denominational body or church involves the adoption of a religious creed and an ecclesiastical polity. Adherence to a particular body requires, therefore, adherence to both the creed and the polity. To abandon or repudiate either is to abandon or secede from the body whose authority is thus disregarded." In *Rodgers* v. *Burnett*, 108 Tenn. (24 Pick.), 173, 183, 65 S. W., 408, 411, the following principle is stated, viz.: "It is not in the power of a majority of a religious society, by reason of a change of religious views, to carry a property, which has been dedicated to a church, to the support of a new and different doctrine. And the title to church property of a divided congregation is in that part of it, whether minority or majority, which is acting in harmony with its own law; and the ecclesiastical laws, usages, customs, and principles which were accepted among them before the dispute began are the standard for determining which party is right." To the same effect is *Reeves* v.

*Walker,* 8 Baxt. (Tenn.), 277. To same effect: *Mc-Ginnis* v. *Watson,* 41 Pa., 9; *Schnorr's Appeal,* 67 Pa., 138, 146, 147, 5 Am. Rep., 415; *Roshi's Appeal,* 69 Pa., 462, 467, 8 Am. Rep., 275; *Smith* v. *Pedigo,* 145 Ind., 361, 33 N. E., 777, 19 L. R. A., 433; same case on rehearing, 145 Ind., 361, 392, 44 N. E., 363, 32 L. R. A., 838; *Ferraria* v. *Vasconcelles,* 23 Ill., 456; *Vasconcellos* v. *Ferraria,* 27 Ill., 237; and Id., 31 Ill., 54, 55; *Mt. Zion Baptist Church* v. *Whitmore,* 83 Iowa, 138, 49 N. W., 81, 13 L. R. A., 198; *Cape* v. *Plymouth Cong. Church,* 117 Wis., 150-155, 93 N. W., 449; *Frank* v. *Mann,* 106 Wis., 132, 81 N. W., 1014, 48 L. R. A., 856, 861, 862.

In *McGinnis* v. *Watson,* supra, it appeared that a division had arisen in a particular congregation of the Associate Church because a minority of that church dissented from the union with the Associate Reformed Church; the majority agreeing to the union. Each faction claimed the church property. The question of the ownership was made to turn upon the validity of the union. The court held the union good or valid, but did not base its judgment upon the point that the effecting of the union presented an ecclesiastical question, and that the decision of it by the church was therefore binding upon the civil court; it, on the contrary, made an extensive examination of the history and principles of the church, and thus determined in favor of the union, and held that the property went with those who adhered to it. 41 Pa., 14-16, 20, 23, 29.

121 Tenn—42

In referring to the last case (*McGinnis* v. *Watson*), Sharswood, J., said, in *Schnorr's Appeal*, supra: "If the opinion of Chief Justice Lowery in this last case may seem to controvert any of these positions, and to hold that a congregation may change a material part of its principles or practices without forfeiting its property on the ground that to deny this 'would be imposing a law upon all churches that is contrary to the very nature of all intellectual and spiritual life,' and because the guarantee of freedom to religion forbids us to understand the rule in this way, I ask leave most respectfully to enter against it my dissent and protest. I do so the more freely because it was entirely extrajudicial to any question in the case. Courts which have the supervision and control of all corporations and unincorporated societies or associations must be guided by surer and clearer principles than those to be derived from the nature of intellectual and spiritual life. The guarantee of religious freedom has nothing to do with the property. . . . It secures to individuals the right of withdrawing, forming a new society, with such creed and government as they please, raising from their own means another fund and building another house of worship; but it does not confer upon them the right of taking the property consecrated to other uses by those who may now be sleeping in their graves. The law of intellectual and spiritual life is not the higher law, but must yield to the law of the land." 67 Pa., 146, 147.

In *Smith* v. *Pedigo*, supra, it appeared that there was

a contest over church property between two factions of a divided congregation. After stating the position of the parties, the court said: "This state of affairs renders it incumbent on the court to ascertain from the evidence, if we can, which one of these factions represents and is the real and true Mount Tabor Regular Baptist, if either is. This involves an inquiry into certain religious doctrines and practices of that church as a religious society or body. Not because the law which we are to declare recognizes any particular form of doctrine or faith and practice as the true one, nor because the law requires any form of doctrine or religious belief from any one, or from any society or church whatever; but because in a case of a divided congregation or religious society on account of a difference of religious belief, faith, and practice, between the disagreeing divisions, it may become necessary, where there is a dispute as to the title to the church property, to inquire which faction or division still adheres to the original faith and doctrine, rules, and laws upon which the church was founded, if either does, and which one has departed therefrom, if either has. These religious doctrines, faith and practices, rules and laws on which a particular church was founded, and the present faith and beliefs of the contending factions, are listened to by the court, not for the purpose of arriving at fundamental or ultimate religious truth, or for the purpose of learning about our true relation to the supposed author of our being, or what our state is to be after this life,

but these religious doctrines and practices are listened to by the court solely as facts upon which civil rights and rights to property are made to depend, regardless of the ultimate truth or soundness of such doctrine, practices, and belief." 145 Ind., 361, 33 N. E., 777, 19 L. R. A., 433, 434. The court referred to the action of the several councils of the church as confirmatory of its own views 'of the matters of faith and practice arising in the case, but reached first its own conclusion on its own reasons. The same principles were adopted and even more strongly enforced in the subsequent hearing of the same case as reported in 145 Ind., 361, 392, 44 N. E., 363, 32 L. R. A., 838 et seq. The court for itself examined and reached its own conclusions as to whether a particular controverted doctrine was the doctrine of the church, and as to which one of the complaining parties stood with the accepted faith of the church. The same is true of the other cases referred to, and particularly of *Mt. Zion Baptist Church* v. *Whitmore.*

There are several cases in which was considered the controversy between the two divisions of the church of the United Brethren of Christ growing out of the amendment of the constitution of that church. These cases, or at least the principal ones, were *Russie* v. *Brazzell,* 128 Mo., 93, 30 S. W., 526, 49 Am. St. Rep., 542; *Schlichter* v. *Keiter,* 156 Pa., 119, 27 Atl., 45, 22 L. R. A., 161, 173; *Philomath College* v. *Wyatt,* 27 Or., 390, 31 Pac., 206, 37 Pac., 1022, 26 L. R. A., 85 et seq.; *Lamb* v. *Cain,* 129 Ind., 486, 29 N. E., 13, 14 L. R. A., 518; *Kuns* v.

*Robertson,* 154 Ill., 394, 400, et seq., 40 N. E., 343.   In considering these cases it should be noted that the church had divided into two general conferences, divided annual conferences, etc., which divisions took place after the amendment was made, the ground of the division being that the amendment had not been made in accordance with the constitution of the church; that the Confession of Faith was not amendable except on request of two-thirds of the people of the church, and that no such request had been made, and lastly that the changes made in the doctrines of the church were fundamental and changed the identity of the church.

In *Russie* v. *Brazzell,* the court construed the constitution of the church for itself, and particularly the alleged change of doctrine, and held (1) that under a proper construction of the instrument there might be a change of the Confession, and (2) that the change actually made was such as the constitution contemplated, and did not impair the identity of the church; but (3) that the general conference had the power to prescribe the rule for submitting the proposed amendments to the vote of the members, and that the method adopted was not contrary to the law of the land or the provisions of the old constitution of the church.   Speaking to the question of doctrine, the court said:   "The question on this branch of the case is, did the revised confession, as requested by the members, and adopted by the general conference, so change the distinctive doctrines of the church as to destroy its identity, and op-

erate as a perversion of the trust under which the property in question was held. However embarrassing it may be, it becomes our duty to determine this question."

In *Schlichter* v. *Keiter,* the court examined for itself whether the doctrines affected by the amendment were so different from the original ones as to destroy the identity of the church. It also construed a section of the constitution as to the power to change the Confession of Faith, and examined the question and decided on its own reasons whether the amendments had been properly made.

In *Philomath College* v. *Wyatt,* the court examined the Confession of Faith and changes made, and decided for itself on the evidence that the changes did not affect the identity of the church, but were changes only for clearness, etc. In speaking to the principles on which the inquiry should be conducted, the court said, quoting from *McGinnis* v. *Watson*: "It seems very plain that we must judge these people and their acts relative to this dispute by the ecclesiastical laws, usages, customs, and principles which were accepted among themselves before the dispute began, and ascertain which party is right, tried by that standard." Again: "Thus it would be seen that church identity, when disputes arise, depends, not alone upon its peculiar creed and dogmas, but also upon the constitution and form of government, discipline, usages, customs, and principles maintained by it prior to the dispute or division. The scope, therefore, of investigation, for the purpose of discovering or

fixing the identity of the genuine conference, comprehends all these necessary elements. Measured by this standard, the identity of the Church of the United Brethren in Christ, and its general conference, in the present case, must be ascertained and determined by reference to its Confession of Faith or fundamental doctrines, constitutional or fundamental law, book of discipline, and its usages and customs prior to the division of the church at York, Pa." The court said, however, that the legislative action of the conference declaring the fact to be that the Confession of Faith, so far as it was clear, had been unchanged, in substance, was "evidence of the highest character touching these questions of faith, and is entitled to great weight."

In *Kuns* v. *Robertson,* there is some language used indicating an apparent adherence to the proposition that the deliverance of the ecclesiastical body in this class of cases is binding on the civil courts, but upon a closer examination, it is perceived that the court, in what was said upon that subject, had reference to disciplinary and administrative cases. The decision is really based upon the reasoning of *Schlichter* v. *Keiter,* supra, a long quotation from which is made. When the court comes to deal directly with the duty of a court of equity to prevent the diversion of church property, on the theory of a trust, from the support of the doctrines to which it was originally dedicated, to other and different doctrines, the principles controlling are stated clearly and firmly. *Id.,* 154 Ill., 415, 416, 40 N. E., 349. It is there

held that it is the duty of a court of equity to act for the purpose of preventing such perversion when it clearly appears that such change or departure has taken place in the fundamental doctrine that it cannot be said to be the same church, or that the denomination as it existed before the change is not in all essential particulars and purposes identical with that existing afterward; that there must be a real and substantial departure from the purpose of the trust. The court concluded: "It therefore follows that, though there be a change in church polity, or alteration in the expressed form of faith, if the substantive theological doctrines and the general polity be retained, there is no such departure as will amount to a misuse or perversion of the trust. In this case, not only the denominational name, but the cardinal doctrines of faith and the general usages and distinctive principles of the church were preserved. The revised Confession of Faith expressed with greater clearness, exactness, and perspicuity of statement the belief of the church, while the amended constitution, retaining the general policy of the church, was more logical, more in keeping with the present age, more explicit and definite. No change whatever was made in the belief, teachings, or practice of the church in any wise affecting its fundamental doctrine or polity. The substance was retained, and the form and manner of expressing it were altered and improved."

In *Lamb* v. *Cain*, supra, the supreme court of Indiana determined for itself, on an examination and comparison

Landrith v. Hudgins.

of the two constitutions, the old and the new, that there was no substantial difference between them. Following this, there are, in the opinion, some general observations on the conclusiveness of ecclesiastical decisions in matters of doctrine, supported by a reference to cases on matters of discipline. That court also determined for itself, on its own reasons, that the method of putting the amendment was legal. After so deciding, the court followed with the proposition that the decision of an ecclesiastical court, upon an ecclesiastical matter, as to its own jurisdiction, is conclusive upon the civil courts; citing *Chase* v. *Cheney* (Ill.), 10 Am. Law Reg. (N. S.), 295—a case involving a disciplinary controversy in a church. But therein the following is distinctly declared as sound law, viz.: "Where it is alleged, in a cause properly pending, that property thus dedicated is being diverted from the use intended by the donor, by teaching a doctrine different from that contemplated at the time the donation was made, however delicate and difficult it may be, it is the duty of the court to inquire whether the party accused of violating the trust is teaching a doctrine so far at variance with that intended as to defeat the objects of the trust, and if the charge is found true, to make such orders in the premises as will secure a faithful execution of the trust confided. *Watson* v. *Jones,* supra; *Miller* v. *Gable,* 2 Denio (N. Y.), 492; *Atty. Gen.* v. *Pearson,* 3 Meriv., 355; *Watkins* v. *Wilcox,* 66 N. Y., 654; *Atty. Gen.* v. *Dublin,* 38 N. H., 460; *Happy* v. *Morton,* 33 Ill., 398; *Fadness* v. *Braunborg,* 73 Wis., 257, 41 N. W., 84.

But to induce a court of equity to interfere, the case must present a plain and palpable abuse of trust. In the case of *Fadness* v. *Braunborg,* supra, it was said by the court:

"It is not the province of courts of equity to determine mere questions of faith, doctrine or scism not necessarily involved in the enforcement of ascertained trusts. . . . Courts deal with tangible rights, not with spiritual conceptions, unless they are incidentally and necessarily involved in the determination of legal rights. Such trusts, when valid and so ascertained, must, of course, be enforced; but to call for equitable interference there must be such a real and substantial departure from the designated faith or doctrine as will be in contravention of such trust.

"So, in *Happy* v. *Morton,* supra, it was said: 'There must be a real substantial departure from the purposes of the trust, such an one as amounts to a perversion of it, to authorize the exercise of equitable jurisdiction in granting relief.'"

The first paragraph of the foregoing excerpt is quoted with approval in the later case of *Smith* v. *Pedigo,* supra, both in the report of the case in 145 Ind., 361, 33 N. E., 777, 19 L. R. A., 433, and in 145 Ind., 361, 392, 44 N. E., 363, 32 L. R. A., 838. In the case of *Bear* v. *Heasley,* 98 Mich., 279, 57 N. W., 270, 24 L. R. A., 621 (reaffirmed in *Lemp* v. *Raven,* 113 Mich., 375, 71 N. W., 627), in which the court had under consideration the same controversy, the same right of independent judgment was ex-

Landrith v. Hudgins.

ercised, without regard to the conclusion reached by the ecclesiastical body.

Likewise, the same right of independent examination on the part of the civil court, as respects matters of doctrine, is asserted in the oft-quoted, and, as we think, frequently misunderstood, case of *Watson* v. *Jones*, 13 Wall., 679, 20 L. Ed., 666. See this case examined and distinguished in *Smith* v. *Pedigo*, 145 Ind., 361, 392, 44 N. E., 363, 32 L. R. A., 838, 839, 840, and applied, as here, in *Franke* v. *Mann*, 106 Wis., 132, 81 N. W., 1014, 48 L. R. A., 856, 861. In *Watson* v. *Jones*, the court said that it hardly admitted of doubt, that an individual or an association of individuals might dedicate property by way of trust to the purpose of sustaining, supporting and propagating definite religious doctrines or principles, provided that in so doing they violate no law of morality, and give to the instrument by which their purpose is evidenced the formalities which the law requires. The opinion then proceeds: "And it would seem also to be the obvious duty of the court, in a case properly made, to see that the property so dedicated is not diverted from the trust which is thus attached to its use. So long as there are persons qualified within the meaning of the original dedication, and who are also willing to teach the doctrines or principles prescribed in the act of dedication, and so long as there is any one so interested in the execution of the trust as to have a standing in court, it must be that they can prevent the diversion of the property or fund to other and different

uses. This is the general doctrine of courts of equity as to charities, and it seems equally applicable to ecclesiastical matters. In such case, if the trust is confided to a religious congregation of the independent or congregational form of church government, it is not in the power of the majority of that congregation, however, preponderant, by reason of a change of views on religious subjects, to carry the property so confided to them to the support of new and conflicting doctrine. A pious man building and dedicating a house of worship to the sole and exclusive use of those who believe in the doctrine of the Holy Trinity, and placing it under the control of a congregation which at the time holds the same belief, has a right to expect that the law will prevent that property from being used as a means of support and dissemination of the Unitarian doctrine, and as a place of Unitarian worship. Nor is the principle varied when the organization to which the trust is confided is of the second or associated form of church government. The protection which the law throws around the trust is the same. And though the task may be a delicate one and a difficult one, it will be the duty of the court in such cases, when the doctrine to be taught or the form of worship to be used is definitely and clearly laid down, to inquire whether the party accused of violating the trust is holding or teaching a different doctrine, or using a form of worship which is so far variant as to defeat the declared objects of the trust."

The court refers to *Atty. Gen.* v. *Pearson,* 3 Mer., 353, and *Miller* v. *Gable,* 2 Denio (N. Y.), 492. In both of these cases the doctrine is strongly stated. In the latter case, see particularly the opinion of Porter, Senator, pp. 552-570; and also see the opinion of Gardner, President, pp. 540-549; and the opinion of the chancellor, *Gable* v. *Miller,* 10 Paige (N. Y.), 627, 647; also *Kniskern* v. *Lutheran Churches of St. John and St. Peter,* 1 Sandf. Ch. (N. Y.), 439.

In speaking of the duty, and of the attitude, of the civil court in disposing of such controversies, it is said in the last-cited case: "The defendants also make it a point that the question whether or not they are ortho-dox can only be determined by the proper ecclesiastical tribunal, and cannot be decided by this court. . . . It would be an immense relief to me in this case if I could repose upon the decision of a synod or classis, as was done in a great measure in the New Jersey case of *Den. ex dem. De Mott* v. *Bolton,* 12 N. J. Law, 206. The chancellor, however, in the *Baptist Church in Hartford* v. *Witherell,* 3 Paige (N. Y.), 304, 24 Am. Dec., 223, said that when this court is obliged to administer a trust, the chancellor cannot put his conscience into the keeping of any ecclesiastical tribunal." *Stebbins* v. *Sherman,* 1 Sandf. Ch. (N. Y.), 510.

We should not close this branch of the discussion without referring to a very important case decided in the House of Lords in 1904, viz., *General Assembly of Free Church of Scotland et als., Appellants,* v. *Lord Overtoun et als., Respondents.*

The controversy in that case arose and was disposed of as follows:

The denomination of Christians, which called itself the Free Church of Scotland, was founded in 1843. It consisted of ministers and laity who seceded from the Established Church of Scotland, but who professed to carry with them the doctrine and system of the Established Church, only freeing themselves by secession from what they regarded as interference by the State in matters spiritual. Two main fundamental doctrines which the appellants, the minority of the Free Church, asserted that the seceders in 1843 carried with them and issued in their Claim, Declaration, and Protest to their supporters and benefactors in that year to stand for all time were the Establishment Principle, and the unqualified acceptance of the Westminster Confession of Faith, and they further asserted that these doctrines were part of the constitution of the church and could not be altered. In 1843 and subsequent years the response to the appeal for funds was most bountiful, and the Free Church was endowed by the liberality of its members, the property being secured under what was called a "Model Trust Deed." For many years efforts had been made to bring about a union between the Free Church and United Presbyterian Church, also seceders from the Established Church, but a church pledged to disestablishment. In 1900, acts of assembly were passed by the majority of the Free Church, and unanimously by the United Presbyterian Church, for union, under the

Landrith v. Hudgins.

name of the United Free Church, and the Free Church property was conveyed to new trustees for the benefit of the new church. The United Presbyterian Church was opposed to the Establishment Principle, and did not maintain the Westminster Confession of Faith in its entirety. The act of union left ministers and laymen free to hold opinions as regards the Establishment Principle and the predestination doctrine (in the Westminster Confession) as they pleased. The respondents contended that the Free Church had full power to change its doctrines so long as its identity was preserved. The appellants, a very small minority of the Free Church, objected to the union, maintaining that the Free Church had no power to change its original doctrines, or to unite with a body which did not confess these doctrines, and they complained of a breach of trust, inasmuch as the property of the Free Church was no longer being used for the benefit of that church. They brought an action in the name of the general assembly of the Free Church, asking substantially for a declaration that they, as representing the Free Church, were entitled to the property.

The court held that the identity of a religious community described as a church consists in the identity of its doctrines, creeds, confessions, formularies, and tests; that the bond of union of a Christian association may contain a power in some recognized body to control, alter, or modify the tenets or principles at one time professed by the association, but the existence of such a

power must be proved; that the Establishment Principle and the Westminster Confession were distinctive tenets of the Free Church; that the Free Church had no power, where property was concerned, to alter or vary the doctrine of the church, that there was no true union, as the United Free Church had not preserved its identity with the Free Church, not having the same distinctive tenets; and that the appellants were entitled to hold for the benefit of the Free Church the property held by the Free Church before the union in 1900. Law Reports, Appeal Cases, pp. 515, 516.

In this case the judges examined and compared freely the matter of doctrine. One observation made by Lord Robertson is particularly appropriate to the facts of the case before us in what is said concerning the subject of a "significant agreement" and "such an agreement" as to warrant union, etc. Said Lord Robertson:

"Another matter of salient importance demands attention. One of the recitals in the act of general assembly of the Free Church by which they authorized the union is that 'the committees of the two churches having met and communicated to one another the existing doctrinal standards, rules, and methods of the two churches, it appeared that, in regard to doctrine, government, discipline, and worship therein set forth, a remarkable and happy agreement obtained between them and also in particular in the views of the two churches in respect to the spirituality and freedom of the Church of Christ—her subjection to him as her only head and

to his Word as her supreme standard, and that an incorporating union might harmoniously be accomplished. There is no profession of identity, but of an 'agreement' having been 'obtained' which is described as 'remarkable.' Now, the steps and stages of these long negotiations are before the House, and from these it appears that on this question of Establishment there were, in 1863 and 1867, sharp differences. The tenets of the two bodies are printed in parallel columns in the printed paper, and I am going shortly to refer to them." *Id.,* p. 669.

Another observation, by the Lord Chancellor, is particularly apposite to the subject of the "liberty of belief" referred to in the negotiations for union attempted in the present case, and which we have discussed in a former part of the opinion, viz.:

"But there is another and a further ground upon which, I think, the appellants are entitled to succeed. and that is that the so-called union is not really a union of religious belief at all. The united body has united in its organizations. It has established its various administrative arrangements, has declared its authority as the United Free Church, and in that name has absorbed the various bodies of the United Presbyterians and the Free Church, as originally constituted; but has it agreed in the doctrines, or either of them, and, if so, which is it that has given way?

"My Lords, I am bound to say that after the most

121 Tenn—43

careful examination of the various documents submitted to us, I cannot trace the least evidence of either of them having abandoned their original views. It is not the case of two associated bodies of Christians in complete harmony as to their doctrine agreeing to share their fund, but two bodies, each agreeing to keep their separate religious views where they differ, agreeing to make their formularies so elastic as to permit persons to accept them according as their respective consciences will permit.

"Assuming, as I do, that there are differences of belief between them, these differences are not got rid of by their agreeing to say nothing about them, nor are these essentially diverse views avoided by selecting so elastic a formulary as can be accepted by the people who differ, and say they claim their liberty to retain their differences while purporting to join in one Christian church. It becomes a colorable union, and no trust fund devoted to one form of faith can be shared by another communion simply because they say, in effect, there are some parts of this or that confession which we will agree not to discuss, and we will make our formularies such that either of us can accept it. Such an agreement would not, in my view, constitute a church at all, or, to use Sir William Smith's phrase, it would be a church without a religion, its formularies would be designed not to be a confession of faith but a concealment of such part of the faith as constituted an impediment to the union." *Id.,* pp. 627, 628.

As to what would be a sufficient indication of a trust, we note the following: In *Miller* v. *Gable,* 2 Denio (N. Y.), 548, it is said: "The grants to most of our churches, particularly since the act of 1784, are general in their terms, frequently nothing more than a conveyance to the religious incorporation by name. In these cases the corporate or denominational name, in connection with the contemporaneous acts of the corporators, may be a sufficient guide as to the nature of the trust in respect to doctrines esteemed fundamental. If a society incorporated by the name of Unitarian has for its pas- tor a Unitarian minister, we could safely infer from that it was not the intention of the founders that their bounty should be applied to the dissemination of Trin- itarian doctrines." On pages 555 and 556 of 2 Denio (N. Y.) it is said: "We have here property devoted by the donors to pious uses, and to be administered by a particular Christian church, which held certain well- known religious opinions, and which church was under the government of certain ecclesiastical authority; and if the court can ascertain precisely what these tenets were, and what church government was within the views of the donors, it is the province of the court and its duty to direct the property to be placed in the hands of those who acknowledge the same doctrines, and obey the same authority." In *Smith* v. *Pedigo,* supra, 145 Ind., 416, 44 N. E., 371, 32 L. R. A., 846, it is said: "But there is still another item of evidence, of a very vital and controlling character, that counsel ignore, and

that is that the church record put in evidence shows that when the church was organized it was named a 'Regular Baptist Church,' and its denominational name has never been changed.   No principle is better settled than that property conveyed to trustees for the use of a church by its denominational name, as was the case here, creates a trust for the promulgation of the tenets and doctrines of that denomination"—citing *Hale* v. *Everett*, 53 N. H., 9, 16 Am. Rep., 82, *Ferraria* v. *Vasconcellos,* supra, *Kniskern* v. *Lutheran Churches,* supra, and *Miller* v. *Gable,* supra.   In *Franke* v. *Mann,* supra, 106 Wis., 131, 81 N. W., 1019, 48 L. R. A., 861, it is said: "What has been said is in harmony with the law regarding trusts for religious uses, whether the trustees be officers of a religious corporation or of an unincorporated ecclesiastical body, as indicated by the numerous authorities cited in the brief of counsel for respondent, among which are the following [citing authorities]. "The governing idea in all such cases is that property held by the trustees of a church society has impressed upon it a character in harmony with the creation of the trust, and that any change of such character is a violation of such trust.   If property be conveyed to trustees for use of the corporation, and its organic act proclaims the religious belief of its members, and sect to which it belongs, so as to indicate clearly the particular use intended by the grantor, or the conveyance expressly indicates the limitations upon such use, or if a corporate organization be formed as a society of a particular

church, and it becomes possessed of property in any way in trust to that end, in either case the property is held in trust for the use so indicated, and such use cannot be perverted without consent of all the parties to the trust." See, also, *Schnorr's Appeal*, 67 Pa., 146, 5 Am. Rep., 415; *Roshi's Appeal*, 69 Pa., 468, 8 Am. Rep., 275; *Kniskern* v. *Lutheran Churches*, 1 Sandf. Ch., 439, 7 N. Y. Ch. Rep., 435, and note on page 437.

The property involved in the present controversy was conveyed ty Moses H. Bonner "to the officers of the Cumberland Presbyterian Church and their successors in office for the use and benefit of the said Cumberland Presbyterian Church"; expressing a consideration of $600, and describing the property. Shannon's Code provides as follows:

"Sec. 2563. All lands bought or otherwise acquired by any religious denomination or society, shall be vested in a board of trustees or other persons designated by the members of such denomination or society, for the use and benefit thereof.

"Sec. 2564. In all cases where any elders, trustees, or other church officer or officers, in any of the various churches or organizations of any religious denomination in this state, shall have had, or may hereafter have, any lands conveyed to them for the use of their respective churches or congregations as building sites, or for any other purpose, by deed, grant, devise, or in any other manner, they or their successors in office, according to the regulations of such church or congregation,

may sell and convey the same by deed, which deed, when officially signed by such elders, trustees, or other church officer or officers, or their successors in office, and proven and registered as other deeds, shall pass the title, whether for life, for years, or in fee, to such land to the purchaser in as full and ample a manner as if said church officer or officers held the same as a corporation, and had conveyed it by deed under their corporate deed (name)."

The conveyance created a trust in favor of the Cumberland Presbyterian Church at Fayetteville; that is, the members of that church, and their successors, composing the congregation of that church. The doctrines intended to be promulgated in its use are indicated by the term "Cumberland Presbyterian." These terms indicate the doctrines and polity of that church, and it is apparent from the record that the property was so used from the execution of the deed in 1852 continuously until the recent troubles arose. In the creation of the trust we do not think it material that it had its origin in a conveyance for a monetary consideration instead of a donation. The persons paying the consideration, whether the members of the church, or others for them, would be regarded as having had the deed executed by the maker of it for the purpose expressed therein, and the trust so created to the intent and in the manner above indicated.

"When property, real or personal," said Sharswood, J., in *Schnorr's Appeal,* "is vested in a religious society, whether incorporated or not , as a church or congrega-

tion for the worship of Almighty God, and the promotion of piety and godly living, it is a charitable use, whether the donors be one or many. The corporation or society are trustees, and can no more divert the property from the use to which it was originally dedicated than any other trustees can." 67 Pa., 146, 5 Am. Rep., 415.

We do not think it material whether the controversy arise under a bill in equity preferred by one or more claiming under the trust and seeking to preserve the integrity of that trust by asking the aid of the court to prevent the diversion of the property from the uses laid down in the trust, or whether it arise in the form of a contest between two factions of a divided congregation necessitating an inquiry into the identity of one or the other faction with the church as it stood before the controversy began. In each case, the court having the matter in hand for decision must for itself examine the constitution, doctrines, and polity of the church, and on its own responsibility determine whether the trust has been, or is about to be, invaded, or which of the contending factions is loyal to the constitution, laws, and polity of the organization as it stood before the controversy arose; that is, which faction is identified with the organization and is the true church. The trust may be violated, or threatened, by an attempted union with another denomination holding different doctrines.

The principles above indicated, however, do not preclude the change or amendment of doctrines, or consti-

tutional provisions, preparatory to a union. But the
amendment must be made in the manner provided by the
constitution. In *Lamb* v. *Cain,* it is said: "It is un-
doubtedly true that the organic law cannot be changed
in any other manner than that provided by the instru-
ment itself, where it provides for an amendment or
change," etc. *Lamb* v. *Cain,* 129 Ind., 515, 29 N. E., 21,
14 L. R. A., 528. In *Philomath College* v. *Wyatt*: "No
one will contend that this constitution can be legally
changed except by the methods therein provided, nor
will any one seriously contend that the general con-
ference had the power to change or do away with the
Confession of Faith without the constitution being first
regularly and legally modified so as to delegate such
power to that body, or rather to remove the limitation
upon its powers," etc. 27 Or., 475, 31 Pac., 206, 37
Pac., 1026, 26 L. R. A., 89. In *Bear* v. *Heasley*: "The
constitution of the association, and its laws, agreed upon
by the members, contain all of the stipulations of the
parties, and is the law which should govern. The mem-
bers have established a law for themselves. The very
existence of this body depends upon the faithful obser-
vance of its organic law by all its members. The court
must regard the constitution and laws of this body as
the contract by which all the members are bound. The
court cannot make any other contract for the parties
than they have solemnly made for themselves. An
amendment of the constitution of a society must be
adopted in accordance with the provisions of the consti-

Landrith v. Hudgins.

tuition in force at the time of such adoption respecting such amendment; otherwise, it is invalid." 98 Mich., 308, 57 N. W., 280, 24 L. R. A., 621. In *Russie* v. *Brazzell*, 128 Mo., 93, 30 S. W., 526, 49 Am. St. Rep., 542: "It is well settled that a constitution adopted by the people can only be changed, modified, or amended in the manner provided by the instrument itself." *Jaicks* v. *Sullivan*, 128 Mo., 187, 30 S. W., 890. To same effect, *Hochreiter's Appeal*, 93 Pa., 479, 484.

As to the right of a civil court to question the jurisdiction of an ecclesiastical tribunal under its own constitution and laws, where property rights are asserted in the civil court based upon the determination of the ecclesiastical court, we are aware that *Watson* v. *Jones*, supra, lays down a rule different from that which we have indicated as the true rule. With great respect, we feel compelled to express the opinion that that case is, on the general question, opposed to the weight of authority and of reason. We think the rule is a sound one when applied to disciplinary cases, in church tribunals, and to proceedings in those tribunals in respect of the internal administration of the affairs of the church, cases involving the exscinding of members, and the administration of rules and ordinances, and the like. With such matters the civil court has no power to intermeddle at all. But where a right to property is asserted in a civil court, based upon the supposed action of a church organization, it is the duty of the civil court to determine for itself whether the act relied on was the act of the

church, or of some body or collection of persons within the church having no power under the church constitution, the contract binding all, to take such action. This proposition was in substance maintained and enforced in *Bouldin* v. *Alexander,* 15 Wall., 139, 21 L. Ed., 69. To same effect: *Watson* v. *Avery,* 2 Bush (Ky.), 332; *Perry* v. *Wheeler,* 12 Bush (Ky.), 541, 554, 556; *First Presbyterian Church* v. *Wilson,* 14 Bush (Ky.), 252; *Watson* v. *Garvin,* 54 Mo., 353, 354, 374, et seq.; *McAuley's Appeal,* 77 Pa., 397, 412; *Kerr's Appeal,* 89 Pa., 97; *O'Hara* v. *Stack,* 90 Pa., 477, 490; *Schweiker* v. *Husser,* 146 Ill., 399, 435, 436, 34 N. E., 1022; *Everett* v. *First Presbyterian Church,* 53 N. J. Eq., 500, 517, 518, 32 Atl., 747; *Connitt* v. *Reformed Dutch Church,* 54 N. Y., 551, 554, 557, 558, 560, 563; *Nachtrieb* v. *Harmony Settlement,* 3 Wall. Jr., 66, Fed. Cas. No. 10003; *Bonacum* v. *Murphy,* supra. As to the difficulties attendant upon such examination, suggested in *Watson* v. *Jones,* they are not greater than those attending inquiries into matters of doctrine, and differences between doctrines, which the same case concedes that the civil court must undertake and overcome in a proper case. For two excellent examples of inquiries of the latter nature successfully prosecuted, see *Gable* v. *Miller,* supra, 10 Paige (N. Y.), 627, and *Kniskern* v. *Lutheran Churches, etc.,* supra, 1 Sandf. Ch. (N. Y.), 439.

Our conclusion on the whole case is that the proceedings taken for union were not effective to merge the Cumberland Presbyterian Church into the Presbyterian

Landrith v. Hudgins.

Church in the United States of America; that the Cumberland Presbyterian Church still remains a vital and independent organization, with a general assembly, synods, and presbyteries; that the defendants are truly identified therewith in doctrine, polity, and organic subordination; that the complainants are not so identified, but have united themselves with another and different ecclesiastical organization; that the defendants are entitled to the church property in controversy at Fayetteville, and the complainants have no interest therein; and that the complainants' bill should be dismissed, with costs.

The chancery court of Lincoln county was without jurisdiction over the lands and houses described in the bill as situated in Davidson, Carroll, and Weakley counties.

Beard, C. J., dissents.